## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA DIVISION

| | |
|---|---|
| STACY STROBL and BRIAN HARDING, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>     v.<br><br>PAUL CROFT; JONATHAN FROST; RHINO ONWARD INTERNATIONAL, LLC; ROI FUND I, LLC; ROI FUND II, LLC; ROI FUND III, LLC; ROI FUND IV, LLC; BRIAN KAWAMURA; CROFT & FROST, PLLC; THE WELL FUND LLC; SCORPIO REF, LLC; MATTHEW DIRA; THE DIRA GROUP; CHESTNUT HOLDINGS, LLC; STEVEN FROST; LISA FROST; JOSEPH INVESTMENTS, LLC; JANE and JOHN DOES 1-25,<br>                Defendants. | Case No.<br><br>**JURY DEMANDED**<br><br>Judge: |

## <u>COMPLAINT</u>

1.      Plaintiff Stacy Strobl and Brian Harding on behalf of themselves and all others similarly situated (collectively the "Plaintiffs") bring this complaint against the Paul Croft, Jonathan Frost, Rhino Onward International, LLC, ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC, ROI Fund IV, LLC (collectively the "ROI Defendants"), Brian Kawamura ("Kawamura"), Croft & Frost, PLLC ("CF"), The Well Fund LLC, (the "Well Fund"), Scorpio Ref LLC ("Scorpio"), Matthew Dira, and the Dira Group (collectively "Dira"), Chestnut Holdings, LLC ("Chestnut Holdings" collectively with the ROI Defendants, Kawamura, CF, Well Fund, Scorpio, and Dira, the "Defendants"), Steven Frost, Lisa Frost, Joseph Investments, LLC ("Joseph Investments" and collectively with the Steven and Lisa Frost the "Transferee Defendants"), and allege the Defendants committed fraud and conversion when they sold or help to sell fake investments in Rhino Onward International, LLC to help prop up CF and enrich themselves at the expense of investors.

## INTRODUCTION

2.      Rhino Onward International, LLC, an oddly named corporation carrying an acronym of "ROI", is ostensibly a green energy company that claims it "creates the greenest and cleanest cradle-to-grave renewable energy by harvesting Solar Energy and brackish (non-potable) water to generate electricity, green hydrogen, and clean

2

water"[1] Rhino Onward International has never created any electricity and has no actual green hydrogen operations.

3.     Jonathan Frost ("Frost") and Paul Croft ("Croft") founded Rhino Onward International, LLC in January of 2022 and incorporated the entity in Chicago, Illinois. Paul Croft is the Chairman and Jonathan Frost is the Vice Chairman. Brian Kawamura was its Chief Executive Officer.

4.     To ostensibly fund Rhino Onward International's operations, Frost and Croft set up numerous shell companies promising to take moneys raised into these shell companies to make investments into Rhino Onward International. ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC, ROI Fund IV, LLC and Scorpio are examples of such shell companies. Upon information and belief, these shell companies served no purpose and had no real operations.

5.     All investors in the ROI Defendants purchased shares in the ROI Defendants for the sole and exclusive benefit of investing in Rhino Onward International. Frost and Croft routinely promised that Rhino Onward International had the engineering, land development, and scientific expertise to launch an operational green energy hydrogen producing plant. It did not. Rhino Onward International was never going to launch any green energy operations and Frost, Croft, Kawamura, and Dira knew or should have known this.

_____

[1]   *See* Rhino Onward International, LLC's website available at: https://www.rhinoonward.com/ (Last accessed 4/3/2024.).

3

6.     In reality, Rhino Onward International was simply an ongoing part of a conspiracy concocted by Frost and Croft to enrich themselves and their business partners. Frost and Croft used many shell corporations to manipulate investors into believing Frost and Croft held the keys to magic investment opportunities that would guarantee large returns in a short and defined period of time.

7.     Frost and Croft used CF as part of this scheme too, using CF and its clientele to generate investors for their business ventures.

8.     Frost and Croft used the Well Fund as one such business opportunity promising investors guaranteed returns over short periods of time based on ostensible investments in real estate and green energy projects like Rhino Onward International. Scorpio represented another such business entity that Frost and Croft used to promote real estate and green energy investments and specifically used to lure investors into investing in ROI.

9.     In reality none of these business ventures had any actual true business operations. Frost and Croft instead took the investments made by the investors in the ROI Defendants, the Well Fund, Scorpio and other entities and diverted these funds to other operations including paying for payroll at CF and pocketed money for their own personal use. This scheme was short-lived and was doomed to fail, and it did. CF eventually became unsustainable and closed its doors abruptly in September of 2023. Rhino Onward International has similarly shuddered and it has no current ongoing operations or leadership structure. The Well Fund LLC removed Frost from

his manager role and on information and belief is trying to locate the funds he diverted into the various shell companies he controlled.

10.     Upon information and belief, Frost and Croft with the aid of Dira collected over $40 million from investors through the ROI Defendants, the Well Fund and other shell companies.

11.     This action is meant to help investors recoup their money from Frost and Croft and the many individuals that conspired with them to aid and abet their schemes.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1332.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because (1) Certain Defendants have their official residences in this district; and (2) a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

14.     Plaintiff Stacy Strobl ("Strobl") is a resident of Tennessee and purchased a membership interest in ROI Fund I, LLC and ROI Fund II, LLC.

15.     Plaintiff Brian Harding ("Harding") is a resident of Illinois and invested money in ROI through the issuance of a promissory note in Scorpio.

16.     Defendant Paul Croft is a natural person residing in Cook County Illinois and claims to be the founder and chairman of Rhino Onward International.

5

He co-founded CF with Jonathan Frost. He formed Scorpio Ref LLC and upon information and belief was a member and manager of that corporate entity.

17.     Defendant Jonathan Frost is a natural person residing in Hamilton County, Tennessee. He claims to be the co-founder and vice chairman of Rhino Onward International and the founder of ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC, and ROI Fund IV, LLC.

18.     Rhino Onward International, LLC is an Illinois limited liability corporation with its principal place of business located at 1000 W. Lake St., Chicago, IL 60607. Its registered agent is Sandeep Basran, 2543 N. Milwaukee Ave., 2nd Fl, Chicago, IL 60647.

19.     ROI Fund I, LLC is a Tennessee limited liability company with its principal office at 1413 Chestnut St., Ste 401, Chattanooga, TN, 37402. Upon information and belief Jonathan Frost was its single member. It may be served via its Registered Agent, Jonathan D. Frost, at 1413 Chestnut St., Suite 401, Chattanooga, TN, 37402.

20.     ROI Fund II, LLC is a Tennessee limited liability company with its principal office at 1413 Chestnut St., Ste 401, Chattanooga, TN, 37402. Upon information and belief Jonathan Frost was its single member. It may be served via its Registered Agent, Jonathan Frost, at 1413 Chestnut St., Suite 401, Chattanooga, TN, 37402.

21.     ROI Fund III, LLC is a Tennessee limited liability company with its principal office at 1413 Chestnut St., Ste 401, Chattanooga, TN, 37402. Upon

6

information and belief Jonathan Frost was its single member. It may be served via its Registered Agent, Jonathan Frost, at 1413 Chestnut St., Suite 401, Chattanooga, TN, 37402.

22.    ROI Fund IV, LLC is a Tennessee limited liability company with its principal office at 1413 Chestnut St., Ste 401, Chattanooga, TN, 37402. Upon information and belief Jonathan Frost was its single member. It may be served via its Registered Agent, Jonathan Frost, at 1413 Chestnut St., Suite 401, Chattanooga, TN, 37402.

23.    Brian Kawamura is a natural person living in Illinois. During all times relevant to this complaint, he was the Chief Executive Officer of Rhino Onward International. The Court may assert personal jurisdiction over Mr. Kawamura as Rhino Onward International had routine and regular contact with Tennessee and specifically Jonathan Frost during its operations and Mr. Kawamura's role in this case directly relates to his numerous interactions with Jonathan Frost. Upon information and belief, Mr. Kawamura traveled to Tennessee as part of his work with Rhino Onward International and his business dealings with Jonathan Frost.

24.    Croft & Frost, PLLC is a Tennessee Professional Limited Liability Company with its principal place of business located at 1413 Chestnut St., Suite 401, Chattanooga, TN 37402.

25.    The Well Fund LLC is a Tennessee Limited Liability Company with its principal place of business at 5726 Marlin, Rd., Suite 511 Chattanooga, TN 37411. It

may be served via its registered agent, Christopher M. Gant, 5726 Marlin Road, Suite 511, Chattanooga, TN 37411.

26. Scorpio Ref, LLC is an Illinois limited liability corporation that was formed on or around March 3, 2022 and had an active manager of Paul Croft and its registered agent is Sandeep Basran, 2543 N. Milwaukee Ave., 2nd Fl, Chicago, IL 60647. Upon information and belief Paul Croft dissolved Scorpio Ref, LLC on or around October of 2023. Upon information and belief, Scorpio Ref, LLC did business as Scorpio LLC and regularly and routinely signed documents using that name including but not limited to the promissory note at issue in this litigation. A true and correct copy of the Articles of Organization for this entity is attached as **Exhibit A**.

27. Matthew Dira is a natural person living in Virginia. During times relevant to this lawsuit Dira was Executive Vice President of Client Relations for CF. During all times relevant to this complaint, he used his business contacts to put investors in touch with Frost and Croft to continue their schemes. He is the managing director of the Dira Group. At all relevant times Dira was also an employee of CF carrying at times the title of Executive Vice President of Client Relations.

28. Upon information and belief, the Dira Group is an unincorporated business entity owned and operated by Matthew Dira. Its website is available at: ABOUT | dira-group (diragroup.com).

29. Chestnut Holdings, LLC was a Tennessee limited liability company with its principal office at 1413 Chestnut St., Ste 401, Chattanooga, TN, 37402. Upon information and belief Jonathan Frost was its single member and Chestnut Holdings

8

owned the building where CF operated. It may be served via its Registered Agent, Jonathan Frost, at 1413 Chestnut St., Suite 401, Chattanooga, TN, 37402.

30.    Steven Frost is a natural person living in or around Hamilton County, Tennessee. He is the father of Jonathan Frost. Steven Frost is named in this complaint solely for asserting Count VI below.

31.    Lisa Frost is a natural person living in or around Hamilton County, Tennessee. She is the mother of Jonathan Frost. Steven Frost is named in this complaint solely for asserting Count VI below.

32.    Joseph Investments, LLC ("Joseph Investments") is a Tennessee limited liability company organized and created on November 14, 2023. Upon information and belief, Steven Frost or Lisa Frost is its single member. Its principal place of business is located at 300 South Palisades Dr., Signal Mountain, TN 37377. It may be served via its registered agent, Gary Patrick, 537 Market St., Suite 300, Chattanooga, TN 37402. Joseph Investments along with Steven Frost and Lisa Frost shall be known as the "Transferee Defendants". At no point in this Complaint shall the term "Defendants" mean or refer to the Transferee Defendants. Joseph Investments is named in this complaint solely for asserting Count VI below.

## FACTUAL BACKGROUND

### A. Frost and Croft Attempt to Establish Themselves as Rich, Successful Business People.

33.    Frost and Croft were both excellent self-promoters.

34.    In or around May of 2021 Frost launched a podcast called the "General Ledger Podcast" principally geared, at least at first, at promoting schemes to help

9

people make money. Some of his early episodes were entitled "2nd Foundation of Wealth Creation – Identifying Tax Savings," "How Do I Make More Money" and "Frost University – 4 Foundations of Wealth Creation." He produced this podcast on a nearly weekly basis until it suddenly stopped in September of 2023 shortly before CF closed its doors.

35.    Frost regularly promoted himself as someone who had secret knowledge of wealth creation and used his role as an accountant to help promote the idea that he could unlock the tax code to help people generate wealth. This was a regular theme of his podcast.

36.    He promoted himself in various ways including depicting himself as a hustler and other personas as depicted below:



37.     Frost even launched a "Rainmaker Club" where he claimed if "you're looking to crush 7 figures" "you need to bet on yourself like the most successful members of the Rainmaker Club" and join for "$1.[2]

38.     Paul Croft is an equally unabashed self-promoter.

39.     Croft started his own website aimed at telling his story and alleged success. On this website he claimed that "Paul dreamed of earning a seven-figure income by the time he was forty, which became a reality at age thirty-seven. That

---

[2] A copy of the rainmaker club's website is available at: <u>Why your business is…. The Three New Opportunities That 99% Of Business Owners Are Missing Out On (frostrainmakers.com)</u> (Last accessed 4/3/24).

dream became a reality due to establishing life-long relationships and enhancing the personal and financial goals of his clients. Paul's unique ability to form these deep, impactful relationships has enriched his own personal and professional life in unimaginable ways. His main goal is to help the people around him grow personally, professionally, and financially through his life values and professional experiences."[3]

40.     Croft claimed he has a net worth of $700MM and has a goal of becoming a billionaire by 2023. Upon information and belief, Croft is not a billionaire and has drastically overestimated his net worth.

41.     Croft regularly promotes his alleged wealth on social media via Instagram and YouTube amongst other social media websites. He posts pictures of his Ferraris:

---

[3] This website is available at: My Story | Paul Thomas Croft (Last accessed 4/3/24).



42. Croft regularly appears in videos promoting wealth creation schemes and discusses his wild success.

43. According to the Illinois Secretary of State's corporation's database, Paul Croft is the manager of at least 15 corporations formed in Illinois including ROI and Scorpio. Each such corporation has a principal place of business at 1000 W. Lake St., Chicago, IL 60607 and a registered agent of Sandeep Basran, 2543 N Milwaukee Ave 2nd Fl, Chicago, IL 60647-2629. A copy of the Illinois Secretary of State's website showing these corporate entities is attached as **Exhibit B**.

44. Frost and Croft engage in these types of self-promotion activities in order to have a social media presence that would give the veneer that they are successful business people who are extremely wealthy.

13

**B. Frost and Croft Launch CF as an Ostensible Accounting Firm in Chattanooga but Ultimately Used the Accounting Firm to Recruit Investors.**

45.     Frost and Croft liked to promote themselves as accountants who held secrets to unlocking the United States tax code and aiding people in paying less taxes.

46.     In or around 2021 Croft and Frost launched CF an accounting firm based in Chattanooga that provided accounting, tax planning, consulting, and auditing services to individuals and businesses. CF had offices in Chattanooga, Chicago, and St. Paul, Minnesota.

47.     On its website CF claimed that its purpose was "Building Courage. Creating Wealth."

48.     CF claimed on its website that it had over 50 employees.

49.     CF particularly targeted professionals as clients including doctors, realtors, engineers, and entrepreneurs.

50.     Although CF started as a legitimate accounting firm with a traditional accounting practice, over time Croft and Frost eventually saw the accounting firm and its clientele as a potential for recruiting investors.

51.     As part of this CF launched the "Onward Community" and touted it as a "unique opportunity to invest in yourself by having unfettered access to experts in numerous fields of life, the chance to lean on one another for wisdom, and the confidence to walk through life together with the individuals within the program." For a small fee CF clients could gain access to "experts" who would help them "grow and achieve your personal, professional, and financial goals."

14

52. In reality the Onward Community was nothing more than a glammed-up networking scheme that would pull individuals deeper into the Croft and Frost orbit.

53. CF would eventually begin pitching clients on refiling previous years' tax returns using specious tax strategies that were never fully disclosed to clients, but which CF promised would net individuals large refund checks from the IRS.

54. CF would eventually file such amended returns for a variety of clients. Once the client would receive funds from the IRS, a representative of CF, often Frost or Dira would reach out to the client knowing the client had just received a large refund check from the IRS and promised an opportunity to invest in one of Croft and Frost's investment schemes.

55. In or around 2022, ROI became the go-to investment scheme that Croft and Frost would channel their accounting clients to promising them that they could achieve large gains over a short period of time.

56. Upon information and belief, many of the investors in the ROI Defendants were CF clients.

57. As CF pivoted away from traditional accounting services into this networking and tax strategy firm, the business model began to deteriorate as CF could no longer maintain its large overhead while spending significant resources on client development and attempts to obtain investors in Croft and Frost's other business ventures.

58.     Specifically, in or around December of 2022, CF had a cash flow emergency when it did not have available funds to meet payroll requirements. Upon information and belief, CF ultimately obtained the liquidity it needed to satisfy payroll during this time by taking money from the ROI Defendants and using it to pay CF payroll.

59.     In May of 2023, Frost sent an email to CF employees claiming that CF had met a "perfect storm" because it had added approximately 36 additional staff, numerous product lines, and new executive leadership.

60.     Upon information and belief, CF used funds from the ROI Defendants and the Well Fund to prop up CF throughout 2023.

61.     This scheme was doomed to fail, and it did. On September 12, 2023, head of CF's human resources department On, September 12, 2023, Croft & Frost's head of HR communicated: "Due to the ongoing challenges and decline in our company's financial performance, I regret to inform you that we have made the difficult decision to implement an immediate workforce reduction, which unfortunately includes the termination of employment for all employees, effective immediately."

62.     CF ceased operations leaving its numerous accounting clients, all of whom were in need of ongoing accounting services, especially to meet the time to file 2022 tax returns (for those obtaining extensions, such tax returns are due no later than mid-October).

63.     At the time CF closed, many if not all employees had not been paid for the August 11, August 25, and September 8 pay periods. On September 14, 2023, a

16

human resources staffer told CF staff that the unpaid Aug. 11 and 25 and Sept. 8 paychecks had been funded and the now-former employees could expect to receive their pay via direct deposit Friday.

64. After CF closed its doors the building housing CF was put up for sale for $10,000,000.

## C. Frost and Business Partners Launch the Well Fund, LLC as a Real Estate Investment Vehicle Issuing Shady Promissory Notes on Which it Shortly Defaults.

65. In June of 2020, Frost and his business partners Doug McCoy and Tim Stone allegedly incorporated the Well Fund LLC in Tennessee as an ostensible real estate venture.

66. In 2020 the Well Fund acquired a 48-unit apartment building in Chattanooga.

67. At some point in 2021, Frost began soliciting investors into the Well Fund to ostensibly pursue additional real estate investments. Frost used Plummer, clients with CF, Dira and others to locate investors in which to pitch investments into the Well Fund LLC.

68. On information and belief because Frost did not control the operations of the Well Fund LLC and it had other members beside himself, the principal investment vehicle into the Well Fund LLC from these "investors" was the issuance of promissory notes where individuals would send the Well Fund LLC large sums of money and would be paid back on monthly installments. The promissory notes claimed to pay a 20% interest rate.

17

69. Frost, Plummer, and Dira all promised investors that this was a safe mechanism used to generate high rates of guaranteed annual returns.

70. The Well Fund paid on these promissory notes for a set period of time but eventually in or around the beginning of 2023 The Well Fund ceased paying on its outstanding promissory notes.

71. Frost undertook the Well Fund promissory note scam in violation of his obligations under the Well Fund's then existing operating agreement and diverted funds ostensibly for the Well Fund to other business entities owned and operated by Frost. He did this for his own personal gain and to prop up his other failing business ventures. He failed to properly inform any of the promissory note holders of his true intentions to use the funds raised through the promissory notes for his own personal gain or to use them for other business ventures.

72. Upon information and belief, Plummer and Dira knew or should have known Frost's true intentions with the Well Fund promissory note scheme and nevertheless continued to steer investors to Frost. Upon information and belief Plummer and Dira would receive a commission for all investors that they helped Frost persuade to invest into the Well Fund via the promissory note scheme.

73. Frost's promissory note scheme successfully raised millions of dollars, but this money was not put into Well Fund's general operating account so that it could be used on real estate or other investments but instead Frost diverted the funds to help fund ever larger investment projects.

18

**D. Frost and Croft Join Forces and Supercharge Their Investment Scams Promising Investors Green Energy Investments with Outrageous Returns.**

74.     At some point in 2021, Frost and Croft decide to launch numerous business ventures together and specifically launch Solarcode investments, an ostensible green energy company.

75.     On information and belief, Frost used funds he raised through the Well Fund LLC's promissory note scheme to fund the initial efforts in this green energy operation. Solarcode investors were promised a full 100% return within one year.

76.     Upon information and belief, approximately $4 million of the Well Fund LLC capital was paid to Solarcode.

77.     Solarcode had no actual business operations and shuddered in or around January or March of 2022.

78.     Unfazed and possibly encouraged by the money they had already raised, Frost and Croft launched Rhino Onward International with plans to launch their own hydrogen plant for green energy production.

79.     Such an operation is a massive undertaking requiring tens of millions of dollars of investment, engineering expertise, and industrial land development expertise. Frost and Croft have no such expertise.

80.     But the money raised from the Well Fund scam did not have the blessing of the other Well Fund owners. Shortly after CF collapsed and ROI ceased operations, other Well Fund owners sued Frost alleging that he misappropriated Well Fund funds to prop up CF and ROI and other Croft and Frost business ventures without properly

accounting for these funds within Well Fund's books and records or properly informing the owners of the Well Fund what Frost intended to do and did with these funds.

81. The Well Fund was not the only mechanism by which Frost and his business partners raised money for ROI's alleged operations.

82. Frost and Croft also created Scorpio as another corporate entity in which they lured investors into alleged green energy investments including ROI. Specifically, Frost executed promissory notes for investors promising the monies provided would be invested in ROI and promising these note holders large returns over short period of time. Frost would often promise that note holders like Harding would receive a 20% return on the note in less than a year.

83. The money raised through the promissory note scam was not put into ROI like Frost promised.

84. Additionally, Frost created a number of "feeder funds" into ROI where Frost would form a corporate entity like ROI Fund I, ROI Fund II, and ROI Fund III and sell securities interest in these limited liability companies with the ostensible purpose of funding ROI's business operations. Upon information and belief, the money given to the feeder funds was not turned over to ROI's general operating account but diverted to fund the personal and other business interests of Frost and Croft and others.

### E. Frost and Croft's Fraudulent Scheme to Dupe Investors into Believing ROI had a Legitimate Business Purpose.

85. On its website ROI claimed the following:

20



86. The ROI website had numerous shots of energy infrastructures meant to deceive investors into believing that ROI had a legitimate business operation.

87. In reality, ROI had no "clients" and it used neither CSP or PV. It never harvested free solar energy. It had no actual capacity now or in the future to deliver upon any of the promises made to investors.

88. In reality, ROI was merely a means for Croft and Frost and its enablers to dupe investors into parting ways with their hard earned money.

89. Frost along with Dira were particularly involved in selling ROI as a legitimate company by falsely claiming on investor calls or at investor pitch meetings that:

    a.    recent changes to the tax code would allow a company like ROI to obtain lucrative tax credits for launching green energy and hydrogen focused energy products;

b.    an Israeli company would soon be coming on board to provide a huge infusion of cash that would allow early investors in ROI to achieve 20% annual returns on investment;

c.    ROI had negotiated with a Native American tribe in Arizona the lease on land for ROI to construct a large hydrogen/green energy plant; and

d.    ROI would have a hydrogen/green energy plant online by 2025.

90.    All of the aforementioned statements were false and Frost and Dira knew or should have known they were false. Nevertheless, they continued to repeat these claims to investors in the hopes that they could secure ever more investments into ROI. And these misrepresentations worked for a time and throughout 2023 as more investors came on board.

91.    Frost and Dira repeatedly made these statements on monthly investment calls with individuals that invested into ROI and potential investors. The stated purpose of these investment calls were to give investors "updates" on the business operations of ROI but in reality they worked as a mini-sales presentation meant to encourage investors to send Frost even more money.

92.    Kawamura at all relevant times acted as the Chief Executive Officer of ROI. He was paid a salary. He also was involved in the Solarcode venture previously launched by Frost. Kawamura joined at least one of these investor calls and witnessed Frost and Dira's promises about ROI's operations. Kawamura knew or should have known that Frost's claims during this investment call were materially false and

22

misleading and omitted material information about the safety and security of such an investment. Kawamura nevertheless said nothing and instead never joined another call. As CEO he had a duty and obligation to track where and how Frost raised money for ROI and the representations he made to investors. Kawamura instead stuck his head in the sand and let Frost proceed to use ROI in his scheme to dupe investors into investing in ROI.

93.     Plaintiffs like many of the investors that heard Frost's sales pitches believed his story about the riches that ROI would offer. Frost leveraged his reputation as a self-promoter, his accounting relationships, and his so called business acumen into duping investors into believing that Frost (and to a certain extent Croft) were trustworthy business partners that new how to run a green energy project.

94.     Similar to the Well Fund promissory note scheme, Frost created shell companies like ROI Fund I, ROI Fund II, and ROI Fund III and sold membership shares to investors. Material to these representations was Frost's claims that the monies provided would be used to fund ROI's activities and would help launch a robust hydrogen producing plant that would be profitable by no later than 2025. This was never going to happen and Frost knew or should have known that ROI would never be able to launch any green energy production.

95.     Frost often leveraged his status as a CPA in selling ROI investments by claiming that recent changes to the tax code would make these types of green energy businesses very successful in a short period of time and that the time to act on this

great opening was now and that waiting would and could be detrimental to the tax savings being offered.

96. Frost along with Dira held monthly investor calls where Frost, with Dira present, would make the same outlandish claims about ROI's pending success. These calls went through September of 2023 shortly before CF closed and the whole scheme began to unravel.

97. Another purpose of the investor calls was to assuage investor concerns that the promissory notes sold by Frost through his shell companies and the Well Fund were not paying consistent with their terms. The investor calls would provide a story as to why the promissory notes could not be paid consistent with their terms and that investors just needed to "keep their money" in the scheme and eventually investors would get paid as promised. At times during these calls Frost would promise another "tranche" of investments would be opening up to those with the liquid funds to provide further investments and many investors continued to pay additional funds in through promissory notes and membership purchase agreements based on representations made during these investor calls.

98. Frost made these same representations outlined above to those investors in the Well Fund promissory note scheme and promised that the funds they gave to the Well Fund would be used to fund ROI operations.

99. Upon information and belief, Frost secured over $40 million in funding through his outlandish misrepresentations and omissions about ROI.

100.    During all relevant times Kawamura was the CEO of ROI. He appeared on at least two investment calls when Frost and/or Dira made representations about ROI's business operations and its alleged green energy plants. At all times, Kawamura knew or should have known that the promises Frost was making to investors were not achievable. Kawamura nevertheless continued in his role as CEO and provided veneer to Frost concerning the alleged business operations of ROI. Kawamura knew or should have known and as CEO of ROI had a duty to know that Frost, and Dira were using ROI's image and business model to secure funding from investors. Kawamura as CEO had a duty to ensure that those funds being raised by Frost and Dira and others were used for ROI's business operations and were placed in ROI's operating account to be used solely for ROI's business operations. Kawamura failed to ensure this happened and instead allowed Frost to divert these funds to his own personal use and to fund CF and Frost's other business ventures.

**F. Class Representatives Become Victims of the Frost and Croft Investment Scheme.**

101.    Class Representative Strobl invested in ROI through a feeder fund set up by Frost. A true and correct copy of her Membership Interest Purchase Agreements memorializing her interest are attached as **Exhibit C**.

102.    To continue to dupe investors into believing that investments in these feeder funds were really investments in ROI, Frost and others would put together "Account Statements" showing the maturity date and interest rates applicable to these investments and put them on ROI letterhead. A true and correct copy of an account statement received by Class Representative Strobl is attached as **Exhibit D**.

103.     Class Representative Brian Harding invested in ROI through Scorpio through the promissory note scheme. He lent Scorpio $25,000 with the note becoming due on November 21, 2022. A true and correct copy of his promissory note is attached as **Exhibit E**. Scorpio has defaulted on this note. Plaintiff Harding has satisfied all conditions precedent to recovering his money under the promissory note.

### G. Frost's Schemes Unravel and He Enters into Consent Order to Surrender Accounting License.

104.     On or around February 22, 2024, Frost entered into a consent order with the Commissioner of Commerce and Insurance of the State of Tennessee. A true and correct copy of the Consent Order is attached as **Exhibit F** (the "Consent Order").

105.     In the Consent Order, Frost admitted that 18 complaints had been filed against him and CF. The Consent Order states that "numerous complaints related to various investment fraud schemes that [Frost and CF] operated whereby…clients invested money with Respondent in exchange for promised interest rate return payments on the investments that were agreed upon by promissory notes signed by [Frost].

106.     The Consent Order states that Frost "failed to return the full amount of the principal and/or promised interest that was owed to these individuals pursuant to the respective promissory notes that Respondent signed, thereby failing to fulfill the terms of the promissory notes."

107.     The Consent Order identifies at least $1.685 million related to this fraudulent scheme. Based on the information previously alleged in this Complaint, Plaintiffs maintain that the damages to Plaintiffs and the Class far exceed this

26

number. Upon information and belief, the Consent Order only covered the individual complaints referred to or presented to the Commission of Commerce and Insurance and does not detail the full scope of the investment fraud perpetrated by Frost, CF, and others.

108. Frost admitted to the findings of fact contained in the Consent Order.

109. As a result of the Consent Order, the State of Tennessee revoked Frost and CF's accounting license on a permanent basis and without the right to request reinstatement.

## ALTER EGO LIABILITY

110. Frost and Croft were the primary owners and board members of CF, Rhino Onward International, LLC, ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC, and ROI Fund IV, LLC.

111. Croft was the manager of Scorpio and upon information and belief the only person who owned or controlled this corporate entity.

112. Frost was the operations manager of the Well Fund and an owner and principal board member or managing member during all times relevant to this Complaint.

113. Frost and Croft controlled CF, the accounting and investment firm, and controlled Rhino Onward International, LLC, ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC and ROI Fund IV, LLC. Frost controlled the Well Fund. Croft controlled Scorpio.

27

114. Upon information and belief, Frost and Croft commingled funds amongst and between CF, the Well Fund, Scorpio, Rhino Onward International, LLC, ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC, and ROI Fund IV, LLC. Upon information and belief, Forst and Croft commingled funds amongst other corporate entities that they controlled including but not limited to defendants Jane and John Doe 1-25.

115. Frost and Croft failed to maintain corporate formalities and engaged in the free and unaccounted for transfer of money between CF, the Well Fund, Rhino Onward International, LLC, ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC, ROI Fund IV, LLC, and Scorpio Ref LLC.

116. The actions taken by Frost and Croft were done to promote their individual interests at the expense of the individual investors in the Well Fund, Rhino Onward International, LLC, ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC, ROI Fund IV, LLC, and Scorpio Ref LLC.

117. Upon information and belief, the Well Fund, Rhino Onward International, LLC, ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC, ROI Fund IV, LLC, and Scorpio Ref LLC were being used for fraudulent purposes and adhering to the corporate form here would promote fraud and injustice.

118. Frost and Croft, as well as any other individual actors Jane and John Does 1-25, should be held individually liable for the wrongdoing of each of Well Fund, Rhino Onward International, LLC, ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC, and ROI Fund IV, LLC Defendants.

28

119.    Moreover, as agents and corporate representatives of CF, Well Fund, Rhino Onward International, LLC, ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC, ROI Fund IV, LLC and Scorpio Ref LLC each entity is responsible for the individual liability of each corporation and adhering to corporate form in this instance would promote fraud and injustice.

## CLASS ALLEGATIONS

120.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

121.    The Class is defined as: All individuals who invested in ROI through any company owned or controlled by Frost or Croft.

122.    Excluded from the Class: (1) Defendants, any entity or division in which Defendants have a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) and the Judge to whom this case is assigned and the Judge's staff.

123.    **Numerosity:** Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all

29

parties and to the Court. The Class Members are readily identifiable from, *inter alia*, information and records in Defendants' possession, custody, or control.

124. **Typicality:** The claims of the representative Plaintiffs are typical of the claims of the Class. Plaintiffs, like all Class Members, sent money to Frost and Croft with the intent that they would be paid consistent with the terms of their agreement. The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that Frost and Croft and other Defendants have taken the money sent by the investors and used them for their own personal benefit or for purposes other than what was intended. Further, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of fraudulent, deliberate, and/or grossly negligent misconduct resulting in injury to all Class Members.

125. **Commonality:** There are numerous questions of law and fact common to Plaintiffs and the Classes and Sub-Classes that predominate over any question affecting only individual Class Members. These common legal and factual questions include the following:

    a.    whether the Defendants misrepresented to investors the true nature of ROI's business operations;

    b.    whether the Defendants converted funds sent to them for purposes other than ROI's operations;

    c.    whether Defendant knew or should have known that ROI had no legitimate business operations;

30

d.       whether there is in fact a lease on Native American tribal land for ROI to actual operate a green hydrogen plant;

e.       whether Plaintiffs and the Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

f.       whether Defendants have breached their contracts with the Class Members; and

g.       whether Defendants are liable for fraud, conversion, and civil conspiracy asserted in the causes of action set forth below.

126.    **Adequate Representation:**  Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

127.    **Predominance and Superiority:**  Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.  Class

31

treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

## CAUSES OF ACTION

### COUNT I
### FRAUD
**(Asserted Against Frost, Croft, CF, ROI Defendants, Scorpio and Dira)**

128.  Plaintiffs realleges, restates, and incorporates by reference the allegations made in all previous paragraphs.

129.  Frost and Croft diverted money away from the ROI Defendants for their own personal purposes and business ventures.

130.  ROI was never going to become a green energy company generating energy or any type of actual green energy operations. Frost, Croft, Dira and others knew or should have known this.

131.  Frost, Dira, and others made misrepresentations to investors who thought they were investing in a legitimate green energy company by making the following claims:

  a.  recent changes to the tax code would allow a company like ROI to obtain lucrative tax credits for launching green energy and hydrogen focused energy products;

32

b.     an Israeli company would soon be coming on board to provide a huge infusion of cash that would allow early investors in ROI to achieve 20% annual returns on investment;

c.     ROI had negotiated with a Native American tribe in Arizona the lease on land for ROI to construct a large hydrogen/green energy plant; and

d.     ROI would have a hydrogen/green energy plant online by 2025.

132.    These claims were all false.

133.    Plaintiffs and the Class relied upon these statements in sending money to the ROI Defendants, the Well Fund, and Scorpio with the expectation that they were investing in ROI's green energy operations.

134.    Instead, Frost and Croft diverted these funds to their own personal use, including, but not limited to, propping up CF throughout the summer of 2023.

135.    At all relevant times Frost and Croft operated as agents of the ROI Defendants, CF, the Well Fund, and Scorpio making each such entity liable for the actions of Frost and Croft.

136.    Plaintiffs and the Class have been injured in that they sent approximately $40 million to the ROI Defendants and the Well Fund with the expectation that such funds would be used by ROI to launch green energy projects.

137.    As a direct and proximate result of the misrepresentations set forth in this Complaint, Plaintiffs and the Class sustained damages and other losses in an amount to be determined at trial.  Defendants conduct damaged Plaintiffs and the

33

Class, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, and costs, including statutory attorney fees and/or other relief as appropriate. The exact amount of damages shall be proved at trial.

<u>COUNT II</u>
**BREACH OF CONTRACT**
**(Asserted Against the ROI Defendants and Scorpio)**

138.  Plaintiffs realleges, restates, and incorporates by reference the allegations made in all previous paragraphs.

139.  Plaintiffs entered into contracts with the ROI Defendants and Scorpio that are valid, enforceable and sets forth the rights and obligations of the parties thereto.

140.  A true and correct copy of Plaintiff Strobl's agreements with the ROI Defendants are attached hereto as **Exhibit C**. Upon information and belief Class Members have substantially similar contracts with the ROI Defendants and/or the Well Fund in which such investors sent monies to the ROI Defendants and/or the Well Fund in exchange for the returns promised in the promissory notes.

141.  A true and correct copy of Class Representative Harding's agreement with Scorpio is attached hereto as **Exhibit E**. Upon information and belief Class Members have substantially similar contracts with Scorpio and/or the Well Fund Well Fund in which such investors sent monies to the ROI Defendants and/or the Well Fund in exchange for the returns promised in the promissory notes.

142.  Plaintiffs have fully performed all conditions, covenants, and terms to the contracts.

143. The ROI Defendants, Scorpio, and/or the Well Fund have not performed their obligations under the promissory note agreements, specifically they have failed to deliver the payments required by the promissory notes or failed to use the monies as promised in the purchase agreement. The ROI Defendants, Scorpio, and/or the Well Fund are therefore in breach of these contracts.

144. Plaintiffs are entitled to the contractual benefits set forth in the agreements including the rates of returns provided in the agreements along with return of their money consistent with the terms of the promissory notes and investment contracts.

145. As a direct and proximate result of the breaches of contract, Plaintiffs and the Class sustained damages and other losses in an amount to be determined at trial. Defendants conduct damaged Plaintiffs and the Class, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, and costs, including statutory attorney fees and/or other relief as appropriate. Plaintiffs also seek rescission of the agreements and the return of all monies provided to the Defendants. The exact amount of damages shall be proved at trial.

**COUNT III**
**CIVIL CONSPIRACY**
**(Asserted Against All Defendants)**

146. Plaintiffs reallege, restate, and incorporate by reference the allegations made in all previous paragraphs.

147. It is unlawful for a combination of two or more persons to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose

by a criminal or unlawful means when there is resultant damage caused by the defendants' acts committed in furtherance of the conspiracy.

148. Frost, Croft, Dira and Kawamura were business partners and knowingly and/or intentionally worked together, and agreed to conspire together, to willfully, maliciously, and unlawfully injure Plaintiffs and the Class by duping investors into making investments into ROI even though ROI never had a legitimate business operation and had no real plan to launch a green energy project that would generate any revenue or profit.

149. Instead Frost and Croft with the help of Dira, Kawamura, and others including John Does 1-25, acted to make false representations to Plaintiffs and the Class in order to dupe investors into sending money to companies controlled by Frost and Croft.

150. Upon information and belief Frost and Croft committed an overt act when they executed fake documents on behalf of the Well Fund to divert Well Fund assets to CF in order to prop up CF for a period of time.

151. Propping up CF was critical to the Frost and Croft fake investment scheme. CF became a principal place where Frost, Croft, Dira and others found investors for the investment scheme. Upon information and belief, many, if not most, of the investors harmed by the ROI investment scheme described herein were also accounting clients of CF. Had CF closed, investors would have immediately learned that Frost and Croft's various business ventures were not legitimate and would have demanded their money back immediately.

152.    During all relevant times herein Frost and Croft were acting as agents of the ROI Defendants, CF, and/or, the Well Fund and therefore the ROI Defendants, CF, and/or the Well Fund are liable for the actions of Frost and Croft.

153.    During all relevant times, Dira was acting as an agent of the Dira Group and/or CF and therefore the Dira Group and CF are liable for the actions of Dira.

154.    During all relevant times Kawamura was acting as an agent of the ROI Defendants and therefore the ROI Defendants are liable for the actions of Kawamura.

155.    Frost's, Croft's, Dira's, and Kawamura's conduct as alleged herein was done in furtherance of their own private interests, and was willful, malicious, wanton, and oppressive, and done with conscious and callous indifference to the consequences and with specific intent to harm.

156.    Upon information and belief Dira received commissions on the investments they brought into the ROI Defendants and/or the Well Fund.

157.    Upon information and belief Kawamura received a salary for his time working with Rhino Onward International, LLC and was paid with investor money. That money would not have been available except for the misrepresentations and civil conspiracies detailed throughout this complaint.

158.    Accordingly, Plaintiffs are entitled to an award of punitive damages from J.D. Frost and Paul T. Croft, jointly and severally, in an amount to be proven at trial and sufficient to punish, penalize and deter J.D. Frost and Paul T. Croft from engaging in such conduct in the future.

159.    As a direct and proximate result of the civil conspiracy alleged herein, Plaintiffs and the Class sustained damages and other losses in an amount to be determined at trial.  Defendants conduct damaged Plaintiffs and the Class, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, and costs, including statutory attorney fees and/or other relief as appropriate. The exact amount of damages shall be proved at trial.

### COUNT IV
### CONVERSION
### (Asserted Against Frost and Croft)

160.    Plaintiffs reallege, restate, and incorporate by reference the allegations made in all previous paragraphs.

161.    Frost and Croft appropriated the assets belonging to The Well Fund and ROI Defendants to their own use and benefit.

162.    Frost and Croft diverted investments in the Well Fund and the ROI Defendants to their accounting firm CF to pay payroll for its employees for some period of time in order to attempt to gain time before their investment schemes unraveled and their ability to secure new funding from investors disappeared.

163.    Frost and Croft knew that when and if they had to shutter CF, no new investments would be made in Frost and Croft's various business ventures including ROI and/or the Well Fund.

164.    Upon information and belief, Frost and Croft used funds from The Well Fund, LLC for their own benefit.

38

165.   As a direct and proximate result of the Frost and Croft's conversion, Plaintiffs and the Class sustained damages and other losses in an amount to be determined at trial.  Frost and Croft's conduct damaged Plaintiffs and the Class, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, and costs, including statutory attorney fees and/or other relief as appropriate. The exact amount of damages shall be proved at trial.

**COUNT V**
**VIOLATION OF TENNESSEE SECURITIES ACT**
**(T.C.A. § 48-1-101, *et. seq.*)**
**(Asserted Against Frost, the ROI Defendants, CF, and Scorpio)**

166.   Plaintiffs reallege, restate, and incorporate by reference the allegations made in all previous paragraphs.

167.   This Count is asserted by Plaintiff Strobl on behalf of herself and the Class. Plaintiff Strobl's purchase agreements attached as **Exhibit C** hereto represent the sale of a "security" as that term is used in Title 48, Section 1, of the Tennessee Code Annotated.

168.   For purposes of this Count the Term "Defendants" shall mean Frost, the ROI Defendants, CF, and Scorpio.

169.   Frost by virtue of his position and authority over the ROI Defendants, Scorpio, and CF exercised direct control over such entities and at all times and all instances and with regard to all representations acted as an agent of the ROI Defendants, CF, and Scorpio making each such entity liable for the claim asserted herein.

170.   Tennessee Code Annotated § 48-1-121 provides in relevant part:

39

(a) It is unlawful for any person, in connection with the offer, sale or purchase of any security in this state, directly or indirectly, to:

(1) Employ any device, scheme, or artifice to defraud;

(2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

171. Section 48-1-122 creates a private cause of action for violations of Section 48-1-121.

172. Because of Frost's misrepresentations and omission in connection with the sale of the securities, Plaintiff Strobl and the Class were harmed financially because they have paid money for the security interests they have in ROI. ROI is without means to actually operate and provide any investment return as promised by Frost.

173. At all times in the sale of the securities in the ROI Defendants that are the subject of this litigation, Frost made material misrepresentations and omissions in the sale of such securities including but not limited to:

    a.    recent changes to the tax code would allow a company like ROI to obtain lucrative tax credits for launching green energy and hydrogen focused energy products;

40

      b.     an Israeli company would soon be coming on board to provide a huge infusion of cash that would allow early investors in ROI to achieve 20% annual returns on investment;

      c.     ROI had negotiated with a Native American tribe in Arizona the lease on land for ROI to construct a large hydrogen/green energy plant; and

      d.     ROI would have a hydrogen/green energy plant online by 2025.

174.    In addition, Frost failed to inform investors like Plaintiff Strobl and the Class that ROI lacked the technical, financial, engineering, and business acumen to launch any green energy project. Frost failed to inform Plaintiff Strobl and the Class of the risks involved in investing in ROI and instead promised Plaintiff Strobl and the Class that the investment was low risk and would guarantee large returns. Frost made such representations prior to the sale of the securities, after the sale of the securities, and throughout 2023 as investors became increasingly concerned about the safety of their investment.

175.    As a direct and proximate result of the Frost securities fraud described herein, Plaintiffs and the Class sustained damages and other losses in an amount to be determined at trial. Frost's conduct damaged Plaintiffs and the Class, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, and costs, including statutory attorney fees and/or other relief as appropriate. All Defendants are liable for such damages. The exact amount of damages shall be proved at trial.

## COUNT VI
## TENNESSEE UNIFORM FRAUDULENT TRANSFER ACT
### (T.C.A. § 66-3-301, *et. seq*.).
### (Asserted Against the Transferee Defendants)

176.    Plaintiffs reallege, restate, and incorporate by reference the allegations made in all previous paragraphs.

177.    As explained, *supra*, Frost put up the building that housed CF, located at 1413 Chestnut Street, Chattanooga, Tennessee (Frost's "Building"), for sale for $10 million shortly after CF shuttered.

178.    Frost's Building failed to sell, likely due to potential purchasers' well-founded fear that the property would ultimately be clawed back in litigation.

179.    Defendant Joseph Investments was formed on or about November 14, 2023, which was just a few months after CF shuttered, and after Frost's Building failed to sell.

180.    Upon information and belief, Defendant Joseph Investments is controlled by Frost's father, Steve Frost. Based upon a review of publicly available filings, Joseph Investments' principal place of business is Steve Frost's and his wife, Lisa Frost's personal residence, the registered agent is Steve Frost's attorney, and the property deed lists Steve Frost as Joseph Investments' President and Managing Member.

181.    Upon information and belief, on or about November 17, 2023—three days after Joseph Investments was formed—Joseph Investments acquired the deed of trust secured by Frost's Building from First Horizon Bank.

182. Upon information and belief, the lots adjoining Frost's Building were collateral on a $1.5 million loan Steve and Lisa Frost made to Chestnut Holdings.

183. Upon information and belief, Frost went into default on the deed of trust acquired by Joseph Investments and the contract secured by the adjoining lots shortly thereafter, and those properties went into foreclosure.

184. Upon information and belief, Frost's Building was acquired by Joseph Investments at auction for $4.6 million—well below Frost's initial asking price of $10 million.

185. Upon information and belief, the adjoining lots were acquired at auction by Steve and Lisa Frost—Frost's Parents—for $1.2 million.

186. Defendant Frost is a Debtor within the meaning of T.C.A. § 66-3-302(6).

187. Defendant Frost's Building and the adjoining lots were Assets within the meaning of T.C.A. § 66-3-302(2).

188. Plaintiffs and members of the Class have a Claim against Frost within the meaning of T.C.A. § 66-3-302(3) and are therefore his Creditors within the meaning of T.C.A. § 66-3-302(4).

189. The Transferee Defendants are Insiders within the meaning of T.C.A. § 66-3-302(7).

190. Defendant Frost's parents, Steve and Lisa Frost, are his Relatives within the meaning of T.C.A. § 66-3-302(11).

191. The security interests that the Transferee Defendants foreclosed upon were Transfers within the meaning of T.C.A. § 66-3-302(12).

43

192. At the time of the fraudulent transfers as more fully detailed above, Defendant Frost was Insolvent within the meaning of T.C.A. § 66-3-303.

193. Defendant Frost, with the intent to hinder, delay and defraud his Creditors, including Plaintiffs, orchestrated the fraudulent transfers as more fully detailed above.

194. Defendant Frost's intent to hinder, delay and defraud his Present and Future Creditors is evidenced by numerous badges of fraud which are enumerated in T.C.A. § 66-3-305(b), including:

    a.    the Transfers of Frost's Assets were to Insiders—his parents;

    b.    before the Transfers, Frost had been sued or threatened with suit;

    c.    the Transfers were of substantially all of Frost's Assets;

    d.    upon information and belief, the Value of the consideration received by Frost was not reasonably equivalent to the Value of the Assets Transferred or the amount of the obligation incurred because the Assets were not acquired pursuant to a regularly conducted, noncollusive foreclosure sale, so those Assets were not procured by the Transferee Defendants for a reasonably equivalent value within the meaning of T.C.A. § 66-3-304(b).

    e.    Frost was Insolvent or became Insolvent shortly after the Transfer was made or the obligation was incurred;

    f.    the Transfers occurred shortly before or shortly after a substantial debt was incurred by Frost; and

44

g.     Frost transferred the essential assets of the business to a lienor who transferred the assets to an Insider of Frost, his parents.

195.    Immediately after the properties sold at auction, the Transferee Defendants caused the deeds to be recorded and took possession of the land and have ever since remained in possession of it. No consideration passed from the Transferee Defendants to Frost. The Transferee Defendants were well aware of the fact that there was no consideration and of Frost's intent to hinder, delay and defraud his Creditors, including Plaintiffs.

196.    Upon information and belief, at the time of the conveyances, Frost had no other property within the state subject to execution, and he has none now. Unless the property fraudulently conveyed to the Transferee Defendants can be reached and applied to the payment of the Claims of Frost's Creditors, they will remain wholly unpaid.

197.    Plaintiffs request that the Transferee Defendants be cited to answer this petition; that the conveyances be adjudged fraudulent and void as against Plaintiffs; that the conveyances be set aside; that the property conveyed be ordered sold for the satisfaction of Plaintiffs' forthcoming judgment(s); that Plaintiffs have judgment for costs of suit; and that Plaintiffs have such other relief as the court deems appropriate.

## COUNT VII
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIOSN SACT OF 1970 (18 U.S.C. § 1961, *et. seq*.).
### (Asserted Against All Defendants)

198.    Plaintiffs reallege, restate, and incorporate by reference the allegations made in all previous paragraphs.

45

199.  Plaintiffs plead this count in the alternative.

200.  Defendants are persons as that term is defined in 18 U.S.C. § 1961(3).

201.  As noted in the previous sections, Frost, Croft, the ROI Defendants, the Well Fund, Plummer, Dira, and Scorpio along with John Does 1-25 formed an association-in-fact with each other for the purpose of duping investors into providing investments into ROI (the "ROI Investment Scheme").

202.  Defendants created ROI with the veneer that it had operations and capacity to launch an ambitious green energy project and manufacture hydrogen by no later than 2025. This was never going to happen.

203.  Defendants together operated as an enterprise.

204.  Defendants knew or should have known that they were engaged in an unlawful scheme to steal from investors. In doing so they required victims of the investment scheme like Plaintiffs Strobl and Harding and the Class to send money by wire transfer to bank accounts controlled by Frost and/or Croft.

205.  Defendants deceived Plaintiffs Strobl and Harding into sending money over wire transfers based on the material misrepresentations and omissions set forth in this complaint.

206.  18 U.S.C. § 1961(1) defines "racketeering activity" to include "any act which is indictable under…title 18, United States Code…section 1343 (wire fraud)."

207.  Each time Defendants induced investors to invest in ROI and send investments over wire transfers to bank accounts controlled by Frost and Croft, they

46

did so with knowledge that Plaintiffs would not have sent them money but for their material misrepresentations and omissions.

208. Defendants accepted the wire transfers. Upon information and belief, Frost and/or Croft then commingled funds sent to the various feeder funds and related entities like the Well Fund and/or Scorpio by diverting funds away from the intended purpose (i.e. to fund ROI operations) and instead wired these funds to different accounts to shore up Frost and/or Croft's other business ventures or for the personal benefit of Frost and/or Croft.

209. Pursuant to 18 U.S.C. § 1961(5), a "pattern of racketeering activity" requires at least two acts of racketeering activity within 10 years. The aforementioned wire transfer activities constitute more than 2 acts of wire fraud and occurred between 2022 to the present.

210. The Defendants benefited from the enterprise's pattern of racketeering activity by obtaining monies from investors like Plaintiffs Strobl and Harding and the Class that they could use to fund other business ventures or enrich themselves.

211. Defendants conducted and participated in the pattern of racketeering activity described herein and conducted by the association-in-fact described herein.

212. Frost and Croft conducted the pattern of racketeering activity described herein within the scope of their agencies of the ROI Defendants, the Well Fund, and/or Scorpio in that Frost and Croft were principals, members, and/or managers of these entities and held themselves out to Plaintiffs Strobl and Harding and the Class as working on behalf of the ROI Defendants, the Well Fund, and/or Scorpio.

47

Therefore, all Defendants are liable under the doctrines of respondent superior and/or agency.

213.   As a direct and proximate result of the pattern of racketeering described herein, Plaintiffs and the Class sustained damages and other losses in an amount to be determined at trial.  Defendant's conduct damaged Plaintiffs and the Class, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, and costs, including statutory attorney fees and/or other relief as appropriate. All Defendants are liable for such damages. The exact amount of damages shall be proved at trial.

## PRAYER FOR RELIEF

214.   Plaintiffs on behalf of themselves and all others similarly situated, request that the Court enter judgment against all Defendants, and issue an order providing the following relief:

a.   certifying the proposed Class, designating Plaintiffs as a named representatives of the Class, and designating the undersigned as Class Counsel;

b.   an order directing Defendants to provide notice, in a form pre-approved by the counsel identified below, to all current ROI investors of the Class;

c.   an order directing Defendants to pay all damages suffered by Plaintiffs and the Class including but limited to reimbursement of all investments in ROI and payment of the investment returns promised by the promissory notes executed by Plaintiffs and the Class and payment any other consequential and incidental damages;

48

d.      damages and restitution in an amount to be proven at trial;

e.      an award to Plaintiffs and the Class of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

f.      that Defendants disgorge, for the benefit of the Class, all or part of the ill-gotten profits they received from the sale of any investment or promissory notes in ROI;

g.      an award of attorneys' fees and costs, as allowed by law;

h.      an award of pre-judgment and post-judgment interest, as allowed by law;

i.      leave to amend the Complaint to add further subclasses and to conform to the evidence produced at trial; and

j.      such other relief as may be appropriate under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: April 4, 2024                         Respectfully submitted,

By: */s/ Benjamin A. Gastel*

Benjamin A. Gastel (BPR #28699)
**Herzfeld, Suetholz, Gastel, Leniski
 & Wall, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Ph: (615) 800-6225
Fax: (615) 994-8625
ben@hsglawgroup.com

Alyson S. Beridon (BPR #40040)
**Herzfeld, Suetholz, Gastel, Leniski
 & Wall, PLLC**
600 Vine St., Ste 2720
Ph: (513) 381-2224
Fax: (615) 994-8625
alyson@hsglawgroup.com

Scott A. Kramer (BPR #19462)
**The Kramer Law Center**
P.O. Box 240461
Memphis, TN 38124
Ph: (901) 896-8933
thekramerlawcenter@gmail.com

*Attorneys for Plaintiffs and Proposed Class*