UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

STACY STROBL, *et al.*,            )
                                   )
            *Plaintiffs*,          )
                                   )    Case No. 1:24-cv-140
v.                                 )
                                   )    Judge Curtis L. Collier
PAUL CROFT, *et al.*,              )    Magistrate Judge Christopher H. Steger
                                   )
            *Defendants*.          )

## M E M O R A N D U M

Before the Court are motions filed by Defendants Matt Dira ("Defendant Dira") and the Dira Group ("Defendant the Dira Group") (collectively the "Dira Defendants") (Doc. 49) and Brian Kawamura ("Defendant Kawamura") (Docs. 51, 52) to dismiss the complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs Stacy Strobl ("Plaintiff Strobl") and Brian Harding ("Plaintiff Harding") filed a consolidated response in opposition (Doc. 61) and the Dira Defendants and Defendant Kawamura each replied separately (Docs. 72, 73). Additionally, Defendant Kawamura moved to adopt the Dira Defendants' reply (Doc. 72), arguing that he is similarly situated to the Dira Defendants. (Doc. 74.) Plaintiffs have not responded to the motion to adopt the reply.

As an initial matter, the Court finds the issues raised by the three Defendants sufficiently similar to justify consideration of the Dira Defendants' reply (Doc. 72) as it relates to Defendant Kawamura's motions. (*See* Doc. 61 at 2 (Plaintiffs filed a consolidated response due to "overlap of the issues").) The Court will **GRANT** Defendant Kawamura's motion to adopt the Dira Defendants' reply (Doc. 74).

For the reasons set out below, the Court will **GRANT** the motion to dismiss by the Dira Defendants (Doc. 49) to the extent the complaint against them will be **DISMISSED WITHOUT PREJUDICE** for lack of personal jurisdiction.  The Court will **DENY** Defendant Kawamura's motion to dismiss for lack of personal jurisdiction (Doc. 52).  Defendant Kawamura's motion to dismiss for failure to state a claim (Doc. 51) will be **GRANTED IN PART** as to the RICO claim and **DENIED IN PART** as to the civil conspiracy claim.  Plaintiffs' RICO claim against Defendant Kawamura will be **DISMISSED WITH PRJEUDICE**.

## I.  BACKGROUND[1]

Plaintiffs filed a complaint on behalf of themselves and all others similarly situated.  (Doc. 1.)  Plaintiffs claim that the Dira Defendants, Defendant Kawamura, and fourteen other defendants collectively operated a fraudulent enterprise to induce Plaintiffs to invest in Rhino Onward International, LLC ("ROI") through shell companies, but instead diverted the funds to enrich certain defendants and specifically to prop up co-defendant Croft & Frost, PLLC ("CF").  (*Id.* ¶¶ 1, 4, 9–10, 84, 97, 203–04.)

Plaintiffs lost money by investing in the Defendants' fraudulent scheme.  (*Id.* ¶¶ 10–11, 101–03.)  Plaintiff Strobl is a resident of Tennessee who purchased membership interest in two shell companies: ROI Fund I, LLC and ROI Fund II, LLC.  (*Id.* ¶ 14.)  Plaintiff Harding is a

---

[1] The following summary of the facts makes all inferences in favor of Plaintiffs as the non-moving party and does not consider Defendants' "controverting assertions."  *See Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991); *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012).

2

resident of Illinois who "invested money in ROI through the issuance of a promissory note in Scorpio," another shell company.  (*Id*. ¶ 15.)

Defendant Dira lives in Virginia.  (*Id*. ¶ 27.)  During the relevant time, Defendant Dira was an employee of Croft & Frost, PLLC ("CF") and "at times" held the title of Executive Vice President of Client Relations of CF.  (*Id*.)  Defendant Dira is also the managing director of the Dira Group, which Plaintiffs allege "[u]pon information and belief . . . is an unincorporated business entity owned and operated by [Defendant] Dira."  (*Id*. ¶¶ 27–28.)  Defendant Kawamura lives in Illinois.  (*Id*. ¶ 23.)  During the relevant time, Defendant Kawamura was the Chief Executive Officer of ROI. (*Id*.)  Paul Croft ("Mr. Croft") lives in Illinois and Jonathan Frost ("Mr. Frost") lives in Tennessee.  (*Id*. ¶¶16–17.)

In 2021, defendants Mr. Croft and Mr. Frost created Croft & Frost, PLLC ("CF"), an accounting firm with its principal place of business in Chattanooga, Tennessee, with additional offices in Chicago, Illinois, and St. Paul, Minnesota.  (*Id*. ¶¶ 25, 46.)  CF began as a "legitimate accounting firm with a traditional accounting practice."  (*Id*. ¶ 50.)  But CF later began "pitching clients on refiling previous years' tax returns using specious tax strategies . . . which [it] promised would net individuals large refund checks."  (*Id*. ¶ 53.)  After CF filed such amended returns and the client received a refund from the Internal Revenue Service, "a representative of CF, often [Mr.] Frost or [Defendant] Dira would reach out to the client . . . and promise[] an opportunity to invest in one of [Mr.] Croft and [Mr.] Frost's investment schemes."  (*Id*. ¶ 54.)

One such investment scheme centered around ROI.  (*Id*. ¶ 55.)  In January 2022, Mr. Croft and Mr. Frost founded ROI, which was "ostensibly a green energy company."  (*Id*. ¶¶ 2, 3.)  ROI was incorporated in Chicago, Illinois.  (*Id*. ¶ 3.)  Mr. Croft was the Chairman and Mr. Frost was

3

the Vice Chairman. (*Id.*) Mr. Croft and Mr. Frost also created shell companies including ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC ROI Fund IV, LLC (the "ROI Defendants"), the Well Fund, and Scorpio. (*Id.* ¶ 4.) Each of the numbered ROI Funds were incorporated in Tennessee and Mr. Frost was named as the registered agent. (*Id.* ¶¶ 20–22.) Mr. Croft and Mr. Frost falsely promised to use funds invested in the shell companies to invest in ROI. (*Id.* ¶¶ 9, 83, 97–98.) Mr. Croft and Mr. Frost "routinely promised that [ROI] had the engineering, land development, and scientific expertise to launch an operational green energy hydrogen producing plant." (*Id.* ¶ 5.) However, this was false, and "[Mr.] Frost, [Mr.] Croft, [Defendant] Kawamura, and [Defendant] Dira knew or should have known this." (*Id.*)

Plaintiffs assert that, "[u]pon information and belief, many of the investors in the ROI Defendants were CF clients." (*Id.* ¶ 56.) Defendant Dira "used his business contacts to put investors in touch with [Mr.] Frost and [Mr.] Croft to continue their schemes." (*Id.* ¶ 27, 67.) On Plaintiffs' "information and belief," Defendant Dira received a commission for each investor he helped persuade to invest in the Well Fund. (*Id.* ¶ 72.) Defendant Dira "promised investors that [investing in the Well Fund] was a safe mechanism used to generate high rates of guaranteed annual returns." (*Id.* ¶ 69.) But Mr. Frost diverted the Well Fund investments to fund other businesses for his personal gain. (*Id.* ¶¶ 71, 73.) Defendant Dira "knew or should have known [Mr.] Frost's true intentions with the Well Fund promissory note scheme and nevertheless continued to steer investors to [Mr.] Frost." (*Id.* ¶ 72.)

Until September 2023, Mr. Frost and Defendant Dira held monthly investor calls in which "[Mr.] Frost, with [Defendant] Dira present, would make… outlandish claims about ROI's pending success." (*Id.* ¶ 96.) Specifically, Mr. Frost and Defendant Dira falsely claimed that:

4

<ol type="a" start="1">
<li value="1">

a.    recent changes to the tax code would allow a company like ROI to obtain lucrative tax credits for launching green energy and hydrogen focused energy products;

b.    an Israeli company would soon be coming on board to provide a huge infusion of cash that would allow early investors in ROI to achieve 20% annual returns on investment;

c.    ROI had negotiated with a Native American tribe in Arizona the lease on land for ROI to construct a large hydrogen/green energy plant; and

d.    ROI would have a hydrogen/green energy plant online by 2025.
</li>
</ol>

(*Id*. ¶¶ 89, 91.)  Even though both Mr. Frost and Defendant Dira "knew or should have known" these statements were false, they repeated the claims to secure additional investments into ROI. (*Id*. ¶¶ 90–91.)  During the investor calls, Mr. Frost also attempted to assuage concerns that the promissory notes through shell companies and the Well Fund were not being paid according to their terms.  (*Id*. ¶ 97.)  Plaintiffs "relied upon these statements in sending money to the ROI defendants, the Well Fund, and Scorpio with the expectation that they were investing in ROI's green energy operations."  (*Id*. ¶ 133.)

At times, Mr. Frost promised that additional "investments would be opening up to those with the liquid funds to provide further investments and many investors continued to pay additional funds in through promissory notes and membership purchase agreements based on representations made during these investor calls."  (*Id*. ¶ 97.)  Plaintiff Strobl entered into a membership interest purchase agreement with Mr. Frost for interest in ROI Fund I, LLC in January 2023, and ROI Fund II, LLC in March 2023.  (Doc. 1-4 at 2, 8.)  Both agreements include a College Grove, Tennessee, address for Plaintiff Strobl.  (*Id*. at 5, 11.)  In furtherance of the scheme, Mr. Frost sent ROI account statements to Plaintiff Strobl and other investors "showing the maturity date and interest rates

5

applicable to [ROI] investments," in order "to dupe [them] into believing that investments in these feeder funds were really investments in ROI." (*Id.* ¶ 102, Doc. 1-4.)

Defendant Kawamura was salaried as the Chief Executive Officer ("CEO") of ROI. (*Id.* ¶ 92.) Defendant Kawamura joined at least one[2] investment call in which "[Mr.] Frost and/or [Defendant] Dira made representations about ROI's business operations and its alleged green energy plants." (*Id.*) Defendant Kawamura "knew or should have known that [Mr.] Frost's claims during this investment call were materially false and misleading and omitted material information about the safety and security" of investing in ROI. (*Id.*) But Defendant Kawamura did not correct the information, and "never joined another call." (*Id.* ¶ 92.) Despite his role as CEO, Defendant Kawamura "stuck his head in the sand and let [Mr.] Frost proceed to use ROI in his scheme to dupe investors into investing in ROI." (*Id.*) As CEO, it was Defendant Kawamura's duty to ensure that the funds that Mr. Frost, Defendant Dira, and others raised "were placed in ROI's operating account to be used solely for ROI's business operations." (*Id.* ¶ 100.) Instead he "allowed [Mr.] Frost to divert these funds to his own personal use and to fund CF and [Mr.] Frost's other business ventures." (*Id.*) Plaintiffs assert "[u]pon information and belief, Defendant Kawamura traveled to Tennessee as part of his work with [ROI] and his business dealings with [Mr.] Frost." (*Id.* ¶ 23.) Additionally, ROI "had routine and regular contact with Tennessee and specifically [Mr.]

---

2 The complaint also states that Defendant Kawamura attended at least two investment calls. (*Id.* ¶ 100.) The precise number of calls he attended is inconsequential to the Court's analysis.

Frost during its operations and Defendant Kawamura's role in this case directly relates to his numerous interactions with [Mr.] Frost."[3] (*Id.*)

In support of their motion to dismiss for lack of personal jurisdiction, the Dira Defendants filed a declaration by Defendant Dira discussing his contact with the state of Tennessee. (Doc. 50.) Defendant Dira avers that he is a resident of Virginia and was served with process by mail at his home in Virginia. (*Id.* ¶¶ 1–2.) He is the founder of the Dira Group, an insurance company he co-owns with his wife. (*Id.* ¶¶ 3–4.) The Dira Group is located and conducts its business from Virginia, and Defendant Dira has a virtual assistant in the Philippines. (*Id.* ¶ 4.) Approximately ninety percent of the Dira Group's customer base is in Virginia, and ten percent is located elsewhere. (*Id.* ¶ 5.) Defendant Dira has never been licensed to sell insurance in Tennessee. (*Id.* ¶ 6.) Neither Defendant Dira nor the Dira Group have actively solicited business in Tennessee, including in Defendant Dira's role as an independent contractor to CROFT Enterprises, LLC ("Croft Enterprises"). (*Id.* ¶¶ 7, 9.) Defendant Dira does not have a physical office in Tennessee, and does "not make regular phone calls, mailings, or trips to Tennessee for purposes of [his] business." (*Id.* ¶ 7.) He is unaware of any clients who are residents of Tennessee, but if any are, "those relationships are the result of referrals from other clients and members of [his] network." (*Id.*)

---

3 Plaintiffs add that Defendant Kawamura was also "involved in the Solarcode venture previously launched by [Mr.] Frost" (Doc 1. ¶ 92) but do not specify how he was involved. Solarcode investments was another ostensibly green energy company launched by Mr. Croft and Mr. Frost that had no business operations. (*Id.* ¶¶ 74, 77.) Approximately four million dollars was paid from the Well Fund to Solarcode. (*Id.* ¶ 76.)

7

On September 1, 2020, Defendant Dira executed an agreement with Croft Enterprises to work as an independent contractor with the title "Senior Vice President of Finance & Licensed Financial Professional." (*Id.* ¶ 9.)  Mr. Frost had previously been the accountant for the Dira Group and Defendant Dira.  (*Id.* ¶ 8.)  "Croft Enterprises offered tax services and financial and business consulting services."  (*Id.* ¶ 10.)  In his independent contractor role, Defendant Dira "was paid a commission based on referrals of clients for tax preparation, and for sales of life insurance policies."  (*Id.*)

CF and ROI were "affiliated" with Croft Enterprises.  (*Id.* ¶ 11.)  "At some point, entities owned or controlled by [Mr.] Croft and [Mr.] Frost merged or combined."  (*Id.* ¶ 12.)  "Following that combination [Defendant Dira] became an independent contractor for CF" and his "role changed to include responsibilities for client relations."  (*Id.*)  While Defendant Dira was "aware of the existence of several additional entities related to CF, [he] was not employed by them" and never had "knowledge of the corporate relationship between them or their business operations." (*Id.*)  Defendant Dira referred "clients to CF for tax services and to ROI to explore an investment in a purported clean energy project and/or real estate investments touted by [Mr.] Frost."  (*Id.* ¶ 13.)  He was paid commissions for those referrals.  (*Id.*)

Defendant Dira "periodically attended client calls" held remotely by videoconference. (*Id.* ¶ 14.)  Defendant Dira participated from his home office in Virginia.  (*Id.* ¶ 16.)  "On these calls, if [Defendant Dira] spoke, [he] did not provide substantive detail regarding ROI or any other investment vehicles created by [Mr.] Frost and/or [Mr.] Croft."  (*Id.* ¶ 15.)  Defendant Dira was learning about the investments along with the clients on the calls.  (*Id.*)  Defendant Dira moderated the calls, "performing such tasks as admitting callers into the meeting, reading comments posted

8

by attendees for [Mr.] Frost to answer, and occasionally rephrasing [Mr.] Frost's . . . answers." (*Id.*)

Defendant Dira's knowledge of the purported clean energy or other investment projects was limited to the information provided on investor calls. (*Id.* ¶ 17.) He "did not have access to information regarding the financial status, business prospects or performance of ROI or any affiliated entities that was not also provided to the investors." (*Id.*) Further, he "did not present information on these topics on investor calls and had no knowledge regarding the veracity of [Mr.] Frost's statements on those topics." (*Id.*) In reliance on Mr. Frost's representations, Defendant Dira personally invested three-hundred-thousand dollars collectively in the Well Fund and Scorpio, most of which has not been returned to him. (*Id.* ¶ 18–19.)

Defendant Dira attached an unexecuted copy of the independent contractor agreement with Croft Enterprises (Doc. 50-1) as an exhibit to his declaration. (Doc. 50 ¶ 9.) The choice of law provision states that any dispute arising from the contractual relationship shall be governed by Illinois law and decided exclusively by state courts located in Will County, Illinois. (Doc. 50-1 at 8.)

Plaintiffs assert claims of civil conspiracy and violation of the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. § 1961, *et. seq.*, ("RICO") against the Dira Defendants and Defendant Kawamura, and a claim of fraud against the Dira Defendants. (Doc. 1 ¶¶ 128–37, 146–59, 198–213.) The Dira Defendants and Defendant Kawamura each move to dismiss the complaint against them for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Docs. 49, 51, 52.)

## II. STANDARD OF REVIEW

### A. Motion to Dismiss for Lack of Personal Jurisdiction

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the "party seeking to assert personal jurisdiction bears the burden" of proving the court has jurisdiction over the defendant. *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003) (citation omitted). "[I]n the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen*, 935 F.2d at 1458.

When a question of jurisdiction is decided without an evidentiary hearing, the plaintiff need only make a prima facie showing that jurisdiction is proper. *Id*. "In this context, the court reviews the pleadings and other documentary evidence in the light most favorable to the plaintiffs, without considering the defendant's controverting assertions." *Anthony v. Van Over*, No. 3:22-CV-416, 2023 WL 6307960, at *3 (E.D. Tenn. Sept. 27, 2023) (citing *Bridgeport Music, Inc. v. Still N The Water Publishing*, 327 F.3d 472, 478 (6th Cir. 2003)).

### B. Motion to Dismiss for Failure to State a Claim

A defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss under Rule 12(b)(6), a court must accept all the factual allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005)). "[A]llegations asserted upon information and belief are not *per se* insufficient to withstand a Rule 12(b)(6) motion; the Court must consider the pleading's factual allegations as a whole. *Glob.*

10

*Licensing, Inc. v. Namefind Ltd. Liab. Co.*, 582 F. Supp. 3d 467, 479 (E.D. Mich. 2022) (citing

*Smith v. Gen. Motors LLC*, 988 F.3d 873, 885 (6th Cir. 2021) (stating "complaints grounding

claims on 'information and belief' can survive a motion to dismiss" if they "set forth a factual

basis for such belief")); *Gold Crest, LLC v. Project Light, LLC*, 525 F. Supp. 3d 826, 837 n.10

(N.D. Ohio 2021) ("Factual allegations based upon information and belief may be sufficient to

support a plausible claim for purposes of Rule 12(b)(6) analysis where the factual allegations in

the entire pleading allow the Court to draw the reasonable inference that defendant is liable for the

conduct alleged." (citation omitted) (emphasis in original)). "[N]aked assertions devoid of further

factual enhancement contribute nothing to the sufficiency of the complaint." *Flagstar Bank*, 727

F.3d at 506 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and

alteration omitted)).

In deciding a motion under Rule 12(b)(6), a court must determine whether the complaint

contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp.

v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need only contain a "short and plain

statement of the claim showing that the pleader is entitled to relief," *Iqbal*, 556 U.S. at 677–78

(quoting Fed. R. Civ. P. 8(a)(2)), this statement must nevertheless contain "factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* at 678. Plausibility "is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at

556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.* at 679. If a party presents matters outside the pleadings in

11

connection with a motion to dismiss, the court must either exclude those matters from consideration or treat the motion as one for summary judgment.  Fed. R. Civ. P.  12(d).

III.  **DISCUSSION**

A.  **Motion to Dismiss for Lack of Personal Jurisdiction**

Plaintiffs argue that the Dira Defendants and Defendant Kawamura are subject to the Court's personal jurisdiction for two reasons: (1) Defendants have sufficient minimum contacts with Tennessee to extend personal jurisdiction under the Tennessee long-arm statute; and (2) RICO provides for nationwide service of process.  (Doc. 61 at 11–15.)  Plaintiffs do not allege any actions taken by Defendant the Dira Group independent of Defendant Dira so for the purpose of personal jurisdiction the Court considers them together.  (*See generally* Doc. 1.)

1.  **Specific Personal Jurisdiction—Minimum Contacts**

A court's exercise of personal jurisdiction is proper if it is consistent with both the long-arm statute of the state in which it sits and the Due Process Clause of the Fourteenth Amendment. *Youn*, 324 F.3d at 417.  Tennessee's long-arm statute provides that a court can hear any case if doing so is consistent with the Due Process Clause.  *Payne v. Motorists' Mut. Ins. Cos.*, 4 F.3d 452, 455 (6th Cir. 1993) (citing *Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn. 1985)). Therefore, the Court need only determine whether its exercise of personal jurisdiction over Defendants is consistent with the Due Process Clause.

Personal jurisdiction can be general or specific.  *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549–50 (6th Cir. 2007).  Plaintiffs do not assert the Court has general jurisdiction over the Dira Defendants or Defendant Kawamura, but do assert it has specific jurisdiction.  The Court of Appeals for the Sixth Circuit uses a three-part test to determine whether

12

specific jurisdiction exists. *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1294, 1299 (6th Cir. 1989).

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* at 1299 (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 410 F.2d 374, 381 (6th Cir. 1968)).  If any element is not met, the Court lacks personal jurisdiction over the defendant.  *Id.* at 1303.

The first element, purposeful availment, is dispositive in this case.  Purposeful availment requires that the defendant "acted or caused a consequence in [the forum] such that he invoked the benefits and protections of [the forum's] law." *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 900 (6th Cir. 2017).  "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts." *LAK, Inc.*, 885 F.2d at 1300 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  "It is settled that jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation." *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929 (6th Cir. 1974) (citations omitted).  Rather, an individual purposely avails himself of the forum's laws when he intentionally engages in "significant activities within a State" or creates "continuing obligations between himself and residents of the forum." *Burger King Corp.*, 471 U.S. at 475–76 (internal quotations and citations omitted).

The connection "must arise out of contacts that the 'defendant *himself*' creates with the forum state." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King Corp*, 471 U.S. at 475) (emphasis in original).  "[A] defendant's relationship with a plaintiff or third party, standing

13

alone, is an insufficient basis for jurisdiction." *Id*. at 286. But "when a foreign defendant purposefully directs communications into the forum that cause injury within the forum, and those communications form the 'heart' of the cause of action, personal jurisdiction may be present over that defendant without defendant's presence in the state." *Neal v. Janssen*, 270 F.3d 328, 333 (6th Cir. 2001). The Court first considers whether it has personal jurisdiction over Dira Defendants, then turns to Defendant Kawamura.

The Dira Defendants contend that "the key allegations in the [c]omplaint make clear that [Defendant] Dira was acting at all times on behalf of CF and did not himself create a significant connection with Tennessee." (Doc. 49 at 7.) In response, Plaintiffs argue that Defendant Dira purposefully availed himself of Tennessee law by: (1) working for CF, a company based in Chattanooga, Tennessee; (2) working with Mr. Frost, a Tennessee resident; and (3) causing damage to Plaintiff Strobl, a Tennessee resident. (Doc. 61 at 13.)

"When the actual content of the communications into the forum gives rise to an intentional tort action, that alone may constitute purposeful availment." *Neal*, 270 F.3d at 332. "It is the quality of the contacts, not the quantity, that determines whether they constitute 'purposeful availment.'" *Id*. (quoting *LAK, Inc.*, 885 F.2d at 1301). In *Neal*, the Sixth Circuit found the district court had personal jurisdiction where the "false representations [were] at the heart of the lawsuit" and "the actions of sending false information into Tennessee by phone and fax had foreseeable effects in Tennessee and were directed at individuals in Tennessee." *Id*. But to demonstrate purposeful availment in this context, the defendant must know the plaintiff is a Tennessee resident or that communication would reach a Tennessee resident. *See Wright v. Writers Coffee Shop, LLC*, No. 1:17-CV-355, 2018 WL 6729642, at *4 (E.D. Tenn. Dec. 21, 2018) ("Without knowing that

14

Plaintiff was a resident of Tennessee, Defendants could not have purposefully availed themselves of the privilege of causing consequences in Tennessee by interacting with Plaintiff online."); *Schneider v. Hardesty*, 669 F.3d 693, 702 (6th Cir. 2012) ("[I]t is clear to us that had [the defendant] himself mailed the letters to [the plaintiff] knowing they would reach [the plaintiff] in [the forum state], there would be 'purposeful availment' to satisfy due process." (citations omitted)).

In support of their position, Plaintiffs first rely on *Sledge v. Indico Sys. Res., Inc.*, 68 F. Supp. 3d 834 (W.D. Tenn. 2014). (Doc. 61 at 14.) In *Sledge*, the defendants called and emailed the plaintiffs repeatedly over an eighteen-month period as part of a fraudulent scheme to solicit millions of dollars from the plaintiffs to ostensibly purchase gold dust. *Sledge*, 68 F. Supp. 3d at 837–38. One of the defendants communicated with a plaintiff "at a variety of telephone numbers . . . some with Tennessee area codes." *Id*. at 844. The parties often spoke while the plaintiff was in Tennessee and on several occasions they discussed the city of Memphis. *Id*. Applying *Neal*, the Sixth Circuit held that the "alleged fraudulent communications formed the 'heart' of [the] action" as the alleged misrepresentations were "the elements of the cause of action itself." *Id*. at 843–44 (quoting *Rice v. Karsch*, 154 F. App'x 454, 461 (6th Cir. 2005) (quoting *Neal*, 270 F.3d at 332)). The Sixth Circuit also concluded the quality of the "continuing and ongoing series of conversations and emails" was sufficient to find the defendants had purposefully availed themselves of Tennessee. *Id*. at 844. "[T]he [d]efendants' contention that their contacts with Tennessee occurred solely because the Plaintiffs were located in Tennessee [was] also unpersuasive" and the communications "were not random or fortuitous." *Id*. at 845. The evidence showed it was "not a case of a single, isolated call or one where a [d]efendant was unaware that

15

he was dealing in the forum state [but rather] . . . [defendant] made numerous, knowing communications into Tennessee to further his own gains and thus availed himself of the forum." *Id*.

Here, the Court cannot exercise personal jurisdiction over Defendant Dira based solely on his relationship his Mr. Frost or his employment as a contractor for a Tennessee company. *See Weller*, 504 F.2d at 929; *Walden*, 571 U.S. at 286.

As in *Neal*, Defendant Dira's alleged fraudulent communication and referral of clients to CF are the basis for Plaintiffs' claims, and form the "heart of" the claims against him. *See* 270 F.3d at 332–33. But unlike *Neal* and *Wright*, Plaintiffs do not allege facts sufficient to conclude that Defendant Dira's communications were directed at individuals in Tennessee or had foreseeable effects in Tennessee such that this Court has personal jurisdiction over him. *See Neal*, 270 F.3d at 333; *Wright*, No. 1:17-CV-355, 2018 WL 6729642, at *4. Defendant Dira knew that Mr. Frost was a Tennessee resident and that CF had a Tennessee office. However, his employment relationship with Mr. Frost is the only indication that Defendant Dira had any knowing connection with the state. Defendant Dira's role was to refer clients to Mr. Frost and CF, which he primarily did from his home in Virginia. (Doc. 1 ¶¶ 18, 27, 67.) He moderated client videoconferences from Virginia during which he discussed client investments in ROI, a company incorporated in Illinois. (*Id*. ¶¶ 3; Doc. 50 ¶ 14.) Plaintiffs do not allege that Defendant Dira referred any Tennessee residents to Mr. Frost or CF or that he had any reason to know that investors on the videoconference calls were residents of Tennessee or located in the state during the calls. As such, the facts cannot support an inference that Defendant Dira knew that any of the named Plaintiffs or members of the purported class were Tennessee residents or that his communication would reach

16

Tennessee residents. *See Wright*, No. 1:17-CV-355, 2018 WL 6729642, at *4. To the extent Defendant Dira sent information into Tennessee, there is no indication that the effects in Tennessee were foreseeable or directed to Tennessee. *See Neal*, 270 F.3d at 332. The facts alleged cannot support a finding that Defendant Dira's contacts with Tennessee were the result of more than random, fortuitous, or attenuated contacts, *see LAK, Inc.,* 885 F.2d at 1300, or that he purposefully directed false information into Tennessee, *see Neal*, 270 F.3d at 333. Defendant Dira could not have purposefully availed himself of the privilege of causing consequences in Tennessee through the interactions alleged in the complaint. *See Wright*, No. 1:17-CV-355, 2018 WL 6729642, at *4.

This case is also distinguishable from *Environmental 360, Inc. v. Walker*, 713 F. Supp. 3d 442 (M.D. Tenn. 2024), which Plaintiffs also cite in support of their position. (*See* Doc. 61 at 14.) There, the district court cited systematic contacts with the forum state, including routine travel to the state, business cards with a forum state address, and conducting training from the forum state as the basis for personal jurisdiction over the defendant. *Walker*, 713 F. Supp. 3d at 447. There is no evidence of such extensive contact alleged here between Defendant Dira and the state of Tennessee. The Court does not find that Defendant Dira purposefully availed himself of the forum state such that this Court has specific personal jurisdiction over him.

The Court turns now to Defendant Kawamura. Plaintiffs argue this Court has personal jurisdiction over Defendant Kawamura because he "launched a fake business enterprise conspiring with a Tennessee resident and traveled to and made representations into Tennessee to perpetrate this fraud that injured at least one resident of Tennessee"—Plaintiff Strobl. (Doc. 61 at 15.) Further, Plaintiffs assert Defendant Kawamura had a "duty and obligation to ensure that [Mr.] Frost and [Defendant] Dira accurately portrayed the operations of ROI, which [Defendant]

17

Kawamura knew or should have known they were not doing." (*Id.* at 5.) In support of their position Plaintiffs cite *Sledge*, 68 F. Supp. 3d at 840–46, to argue Defendant Kawamura's contacts with Tennessee are sufficient to establish personal jurisdiction. (*Id.* at 15.)

First, Defendant Kawamura's position as the officer of a company that operated in Tennessee is insufficient to demonstrate purposeful availment. *See Weller*, 504 F.2d at 929. Second, Plaintiffs fail to show that Defendant Kawamura engaged in "significant activities" in Tennessee or created "continuing obligations" to Tennessee residents. *See Burger King Corp.*, 471 U.S. at 475–76. Defendant Kawamura is a resident of Illinois. (Doc. 1 ¶ 23.) During the relevant time, he was the Chief Executive Officer of ROI, which was incorporated and had its principal place of business in Illinois. (*Id.* ¶¶ 1, 3, 23.) ROI was founded by Mr. Frost, a Tennessee resident, and Mr. Croft, an Illinois resident. (*Id.* ¶¶ 2, 3, 16–17.) Plaintiffs do not allege Defendant Kawamura communicated with investors in Tennessee or otherwise directed potential Tennessee-resident investors to ROI. (*See generally* Docs. 1, 61.) They also do not allege Defendant Kawamura knew Tennessee residents were among ROI's investors. (*Id.*) Apart from Defendant Kawamura periodically traveling to Tennessee to work with Mr. Frost, Plaintiffs do not assert any facts from which to infer Defendant Kawamura knew ROI or his work with ROI could potentially have effects in Tennessee. Plaintiffs claim Defendant Kawamura knew about ROI's fraudulent operations, but do not show that he "acted or caused a consequence in [Tennessee] such that he invoked the benefits and protections of [Tennessee] law." *See Schmückle*, 854 F.3d at 900.

Beyond allegations made "upon information and belief," Plaintiffs fail to make a prima facie case that the claims against Defendant Kawamura arise from his contacts with Tennessee

18

such that this Court has specific jurisdiction over him based on minimum contacts.  *See LAK, Inc.*, 885 F.2d at 1300; *Glob. Licensing, Inc.*, 582 F. Supp. 3d at 479.

### 2. Conspiracy Theory of Jurisdiction

The parties did not raise the conspiracy theory of personal jurisdiction but the Court addresses it regardless.  Under the conspiracy theory of personal jurisdiction "an out-of-state defendant involved in a conspiracy who lacks sufficient 'minimum contacts' with the forum state may nevertheless be subject to jurisdiction because of a co-conspirator's contacts with the forum." *Chenault v. Walker*, 36 S.W.3d 45, 51 (Tenn. 2001).  Under this doctrine, one co-conspirator's overt act in furtherance of the conspiracy is attributable to other co-conspirators if the act is "of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state." *Id*. at 53 (quotation and citation omitted).

"Although the Sixth Circuit has neither adopted nor rejected a 'conspiracy' theory of personal jurisdiction, district courts within the Sixth Circuit have split on the question." *DayCab Co., Inc. v. Prairie Tech., LLC*, No. 3:20-CV-63, 2021 WL 6275629, at *5 (E.D. Tenn. Aug. 13, 2021) (citations omitted).  "Courts that have applied the conspiracy theory of personal jurisdiction have reasoned that 'because the law considers each member of the conspiracy to be the agent of the other members . . . if one co-conspirator commits acts in the forum which would justify the forum court in exercising personal jurisdiction over it, those acts are attributed to the other co-conspirators and personal jurisdiction exists over them as well." *Id*. (quoting *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 410 F. Supp. 2d 592, 599 (E.D. Ky. 2006)).  Consistent with *Daycab Co*., this Court applies the conspiracy theory of personal jurisdiction in this case.  *See id*.

19

To prevail on a conspiracy theory of personal jurisdiction a plaintiff must allege the elements of a civil conspiracy under Tennessee law: "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006) (citation omitted). As to the first element, "[e]ach conspirator must have the intent to accomplish this common purpose, and each must know of the other's intent." *First Cmty. Bank, N.A. v. First Tenn. Bank*, 489 S.W.3d 369, 396 (Tenn. 2015) (quoting *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn. 2001)). "The agreement by conspirators 'need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy.'" *Id*. (quoting *Dale v. Thomas H. Temple Co.*, 186 Tenn. 69, 208 S.W.2d 344, 354 (Tenn. 1948)). Because civil conspiracies are most often proven by circumstantial evidence "fact-finders may consider the nature of the acts themselves, the relationship of the parties, the interests of the conspirators, and other circumstances." *Id*. (quoting *Stanfill v. Hardney*, No. M2004-02768-COA-R3-CV, 2007 WL 2827498, at *8 (Tenn. Ct. App. Sept. 27, 2007)). But the fact-finder must have "more than a suspicion or conjecture that a conspiracy exists" and the evidence must allow for inference that co-conspirators jointly agreed to accomplish the common purpose. *Id*.

"It is well settled in Tennessee that the tort of civil conspiracy requires underlying wrongful conduct, and that conspiracy, standing alone, is not sufficient to support a cause of action[.]" *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir. 2010) (quoting *Greene v. Brown & Williamson Tobacco Corp.*, 72 F. Supp. 2d 882, 887 (W.D. Tenn.1999)). "If the underlying wrongful conduct is found to be not actionable then the conspiracy claim must also fail." *Id.*

(quoting *Greene*, 72 F. Supp. 2d at 887). When a civil conspiracy claim is based on fraud, the claim is subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." *See Farmer v. Upchurch*, No. 1:21-CV-153-TAV-SKL, 2021 WL 5622104, at *9–10 (E.D. Tenn. Nov. 30, 2021). But "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

As to the Dira Defendants, Plaintiffs repeatedly allege Defendant Dira "knew or should have known" that the claims about ROI's operations and the shell companies' purported investments in ROI were false. (*Id.* ¶¶ 5, 72, 90, 92.) These allegations are not supported by a factual basis from which to infer Defendant Dira had knowledge of the falsity. Defendant Dira "used his business contacts to put investors in touch with [Mr.] Frost and [Mr.] Croft to continue their schemes." (*Id.* ¶ 27, 67.) He received a commission for referrals. (*Id.*; Doc. 50 ¶ 10.) Defendant Dira represented to investors that Mr. Frost's investment opportunities were safe, and Mr. Frost diverted funds for personal enrichment. (Doc. 1 ¶¶ 69, 71, 73.) But Plaintiffs offer no factual basis supporting an inference that Defendant Dira had actual knowledge of Mr. Frost's true intentions or the overall fraudulent scheme. (*Id.* ¶ 72.) Because Plaintiffs do not state a claim for civil conspiracy, the conspiracy theory of jurisdiction cannot support this Court's exercise of jurisdiction over Defendant Dira.

The Court turns next to whether it has personal jurisdiction over Defendant Kawamura under the conspiracy theory of jurisdiction. Plaintiffs identify the overall fraudulent scheme to induce investments in shell companies with the false promise that the funds would be invested in green energy companies which in reality had no operations. They allege that Mr. Frost engaged

21

in overt acts in furtherance of the conspiracy that resulted in injury, satisfying the third and fourth elements of a civil conspiracy. *See Kincaid*, 221 S.W.3d at 38. Specifically, on monthly calls that were held until September 2023, Mr. Frost made specific false claims about ROI operations which are detailed in the complaint. (*Id*. ¶¶ 89, 91.) Mr. Frost issued ROI account statements in order to dupe Plaintiffs into believing they had invested in ROI. (*Id*. ¶ 102, Doc. 1-4.) He also made false statements to induce Plaintiffs to invest in the Well Fund with the expectation that they were investing in ROI's green energy operations. (Doc. 1 ¶ 133.) Plaintiffs "relied upon these statements in sending money to the ROI defendants, the Well Fund . . . with the expectation that they were investing in ROI's green energy operations." (*Id*.) All of these overt acts were done to further the fraudulent scheme and resulted in harm to the Plaintiffs. Plaintiffs identify the fraudulent scheme with sufficient specificity to satisfy Rule 9(b). Under the conspiracy theory of personal jurisdiction, the questions before the Court are (1) whether these overt acts are "of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction" under Tennessee's long-arm statute; and (2) whether Defendant Kawamura was a co-conspirator such that these overt acts are attributable to him. *See Walker*, 36 S.W.3d at 53 (quotation and citation omitted).

First, the overt acts by Mr. Frost are of the type that would allow the Court to exert personal jurisdiction over him under Tennessee's long-arm statute. Mr. Frost created ROI Fund I, LLC, ROI Fund II, LLC, ROI Fund III, LLC ROI Fund IV, LLC which were each incorporated in Tennessee and named Mr. Frost as the registered agent. (Doc. 1 ¶¶ 4, 20–22.) He sold interest in ROI Fund I, LLC and ROI Fund II, LLC to Plaintiff Strobl, who was identified as a Tennessee resident in the membership interest purchase agreement. (Doc. 1-4 at 5, 11.) Plaintiffs' complaint

22

alleges that Mr. Frost knowingly used Tennessee companies to harm Tennessee residents. In doing so, he purposefully availed himself of the state, and the cause of action against him arises out of his actions in Tennessee and contact with Tennessee residents. The Court finds there to be a sufficiently substantial connection with Tennessee to make it reasonable to exercise personal jurisdiction over Mr. Frost. *See LAK, Inc*., 885 F.2d at 1294.

Second, the Court turns to whether Defendant Kawamura joined the "common design" to accomplish an unlawful purpose. *See MedApproach Holdings, Inc. v. Hawkins*, No. 3:11-CV-1199, 2012 WL 6569268, at *6 (M.D. Tenn. Dec. 17, 2012). Plaintiffs assert Defendant Kawamura joined at least one investor call during which he heard Mr. Frost make claims about ROI that he "knew or should have known" were false. (Doc. 1 ¶ 92.) Instead of correcting the claims, Defendant Kawamura "stuck his head in the sand and let [Mr.] Frost proceed to use ROI in his scheme to dupe investors into investing in ROI." (*Id*.) Additionally, while Defendant Kawamura had a duty in his role as CEO to ensure that the funds Mr. Frost, Defendant Dira, and others raised "were placed in ROI's operating account to be used solely for ROI's business operations, he instead "allowed [Mr.] Frost to divert these funds to his own personal use and to fund CF and [Mr.] Frost's other business ventures." (*Id*. ¶ 100.)

Like the claims against the Dira Defendants, Plaintiffs do not cite direct evidence that Defendant Kawamura joined an agreement with Mr. Frost or others to defraud investors. But at this stage the Court makes all reasonable inferences in favor of Plaintiffs. Defendant Kawamura was the CEO of the company at the center of the fraudulent scheme at issue in this matter. Given his alleged duty to monitor the company's finances, the Court finds the nature of the fraud and the relationship between the parties is circumstantial evidence of an agreement to accomplish a

23

common purpose that survives a motion to dismiss. *See Hawkins*, No. 3:11-CV-1199, 2012 WL 6569268, at *6. Accordingly, the Court finds that Plaintiffs state a claim that Defendant Kawamura joined a civil conspiracy and the Court has personal jurisdiction based on the conspiracy theory of judication.[4]

This Court will **DENY** Defendant Kawamura's motion to dismiss for lack of personal jurisdiction (Doc. 52).

### 3. RICO Jurisdiction

Having found the Court has jurisdiction over Defendant Kawamura under the conspiracy theory of jurisdiction, the Court addresses only whether it has personal jurisdiction over the Dira Defendants under the RICO statute. Plaintiffs assert this Court has personal jurisdiction over Defendant based on the RICO provision for nationwide service of process. (Doc. 61 at 12); *see* 18 U.S.C. § 1965. The Sixth Circuit has adopted the forum-state approach to RICO jurisdiction, which

> allows for exercise of personal jurisdiction over nonresident defendants under the RICO [service of process] when 1) the Court has personal jurisdiction over at least one initial defendant pursuant to the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment, 2) venue is proper, and 3) the 'ends of justice' are satisfied.

*Anthony v. Van Over*, No. 3:22-CV-416, 2023 WL 6307960, at *2 (E.D. Tenn. Sept. 27, 2023) (quoting *Peters Broad. Eng'g, Inc. v. 24 Capital, LLC*, 40 F.4th 432, 443 (6th Cir. 2022)). "An inadequately pleaded RICO claim against an out-of-district Defendant cannot support a finding

---

4 Because the Court finds it has personal jurisdiction over Defendant Kawamura, Plaintiffs' request to depose Defendant Kawamura regarding his contacts with Tennessee is moot. (*See* Doc. 61 at 15 n.39.)

24

that the 'ends of justice' require exercising personal jurisdiction." *Id*. at *5. "Any other conclusion would provide the potential for pleading abuses and giving improper incentives for Plaintiffs to include frivolous federal statutory claims with nationwide service of process provisions." *Id*.; *see also Sledge*, 68 F. Supp. 3d at 838 ("[I]f a plaintiff has not stated a claim under a federal law which allows for nationwide service of process, he cannot claim that the district court has personal jurisdiction over a defendant as to those claims.").

First, the Court considers whether Plaintiffs adequately plead a RICO claim against the Dira Defendants. "RICO criminalizes conducting business through a pattern of racketeering activities and provides a civil cause of action for individuals injured by racketeering activity." *Justice v. Petersen*, No. 3:21-CV-28, 2021 WL 3475554, at *4 (E.D. Tenn. Aug. 6, 2021), *aff'd*, No. 21-5848, 2022 WL 2188451 (6th Cir. June 17, 2022) (citing 18 U.S.C. §§ 1962, 1964). "While RICO 'is a criminal statute, an injured party can bring a civil RICO claim against parties who violate any subsection of § 1962.'" *Id*. (quoting *Courser v. Mich. H.R.*, 831 F. App'x 161, 185 (6th Cir. 2020)). To state a claim of a pattern of racketeering activity under § 1962(c), a plaintiff must plausibly allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).

As to the first element, the Supreme Court has adopted the "operation or management test." *Petersen*, 2021 WL 3475554, at *4. (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179–83 (1993)). Under this test, "one is not liable . . . unless one has participated in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 183. "Sufficient conduct requires more than aiding and abetting, . . . and, instead, involves 'some part in directing [the enterprise's] affairs.'"

25

*Petersen*, 2021 WL 3475554, at *4 (quoting *Reves*, 507 U.S. at 179) (internal citation omitted). Directing enterprise affairs "can be accomplished either by making decisions on behalf of the enterprise or by knowingly carrying them out." *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008) (citations omitted).

Here, Plaintiffs assert the Dira Defendants in concert with all other defendants engaged in a pattern of racketeering activity. (Doc. 1 ¶¶ 198–213.) Plaintiffs state the legal conclusions that the defendants "together operated as an enterprise" and "knew or should have known they were engaged in an unlawful scheme to steal from investors." (*Id*. ¶¶ 203–04.) But even viewing the facts in the light most favorable to Plaintiffs, the complaint fails to assert facts to support this claim against the Dira Defendants. Specifically, in the absence of facts sufficient to infer Defendant Dira knew that his and Mr. Frost's claims about ROI were false, Plaintiffs fail to show that Defendant Dira was knowingly carrying out decisions on behalf of the fraudulent enterprise or otherwise directing enterprise affairs. *See Fowler*, 535 F.3d at 418; *Petersen*, 2021 WL 3475554, at *4.

Because Plaintiffs inadequately plead a RICO claim against the Dira Defendants, the claim "cannot support a finding that the 'ends of justice' require exercising personal jurisdiction." *See Anthony*, 2023 WL 6307960, at *5; *Sledge*, 68 F. Supp. 3d at 838. Accordingly, this Court does not have personal jurisdiction over Defendant Dira under the RICO service of process provision.

Having considered the totality of Plaintiffs' allegations regarding Defendant Dira's contacts with Tennessee, including both his business contacts and contact through client referrals and investor videoconferences, the Court concludes it lacks any basis for personal jurisdiction over Defendant Dira. As Plaintiffs do not allege any actions by the Dira Group apart from action by

26

Defendant Dira on its behalf, because the Court lacks personal jurisdiction over Defendant Dira, it also lacks personal jurisdiction over Defendant the Dira Group.[5]

This Court will **GRANT** the motion to dismiss by Defendant Dira and Defendant the Dira Group (Doc. 49) to the extent the claims against the Dira Defendants will be **DISMISSED WITHOUT PREJUDICE** for lack of personal jurisdiction.

### B.    Motion to Dismiss for Failure to State a Claim

#### 1.    Civil Conspiracy

Defendant Kawamura moves to dismiss the civil conspiracy claim against him.  (Doc. 51 at 7.)  This Court will **DENY** the motion to dismiss this claim for the reasons this Court finds it has personal jurisdiction under a conspiracy theory of personal jurisdiction.

#### 2.    Civil RICO

Defendant Kawamura also moves to dismiss the civil RICO claim against him for failure to state a claim.  (Doc. 51.)  Plaintiffs fail to state a claim against Defendant Kawamura for the same reason their RICO claims against the Dira Defendants fail.

---

5 Plaintiffs "request leave to take a short personal jurisdiction deposition of [Defendant] Dira to determine if he traveled to Tennessee for his work with [Mr.] Frost and the accounting firm." (Doc. 61 at 14 n.35.)  Defendant Dira's declaration states that he does not "make regular . . . trips to Tennessee" for business purposes.  (Doc. 50 ¶ 7.)  The Court has discretion to grant a hearing to resolve factual issues.  *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). The Court also considers the evidence "in the light most favorable to the plaintiffs without considering the defendant's controverting assertions." *Anthony*, No. 3:22-CV-416, 2023 WL 6307960, at *3 (citing *Bridgeport Music, Inc.*, 327 F.3d at 478).  Evidence regarding the precise number of trips Defendant Dira made to Tennessee to work with Mr. Frost would not change the Court's analysis in this case.  The briefs and affidavits submitted provide the Court with adequate evidence to decide the issue of personal jurisdiction without the benefit of a hearing.  Plaintiffs' request is denied.

27

Plaintiffs' factual basis for claims against Defendant Kawamura at most allege a pattern of willful ignorance or tacit adoption of fraudulent statements by others by failing to correct fraudulent representations. The allegation that Defendant Kawamura "stuck his head in the sand" and allowed Mr. Frost to defraud investors does not amount to "participat[ing] in the operation or management of the enterprise itself." *See Reves*, 507 U.S. at 183. Even viewing all facts in the light most favorable to Plaintiffs, the facts alleged do not support an inference that Defendant Kawamura was either "making decisions on behalf of the enterprise or . . . knowingly carrying them out." *See Fowler*, 535 F.3d at 418.

Plaintiffs fail to state a RICO claim against Defendant Kawamura that is plausible on its face. Accordingly, the Court will **GRANT** Defendant Kawamura's motion to dismiss for failure to state a claim as to Plaintiffs' RICO claim, which will be **DISMISSED WITH PREJUDICE**.

## IV.    CONCLUSION

The Court will **GRANT** Defendant Kawamura's motion to adopt the Dira Defendant's reply (Doc. 74). The Court will **GRANT** the motion to dismiss by Defendant Dira and Defendant the Dira Group (Doc. 49) to the extent the complaints against them will be **DISMISSED WITHOUT PREJUDICE** for lack of personal jurisdiction. The Court will **DENY** Defendant Kawamura's motion to dismiss to lack of personal jurisdiction (Doc. 52). Defendant Kawamura's motion to dismiss for failure to state a claim (Doc. 51) will be **GRANTED IN PART** as to the RICO claim and **DENIED IN PART** as to the civil conspiracy claim. Plaintiffs' RICO claim against Defendant Kawamura will be **DISMISSED WITH PRJEUDICE**.

**APPROPRIATE ORDERS WILL ENTER.**

28

/s/ _____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

29