# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA DIVISION

| | |
|---|---|
| STACY STROBL and BRIAN HARDING, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>JONATHAN FROST; RHINO ONWARD INTERNATIONAL, LLC; ROI FUND I, LLC; ROI FUND II, LLC; ROI FUND III, LLC; ROI FUND IV, LLC; BRIAN KAWAMURA; CROFT & FROST, PLLC; THE WELL FUND LLC; SCORPIO REF, LLC; MATTHEW DIRA; THE DIRA GROUP; CHESTNUT HOLDINGS, LLC; STEVEN FROST; LISA FROST; JOSEPH INVESTMENTS, LLC; JANE and JOHN DOES 1-25,<br>                    Defendants. | Case No. 1:24-cv-00140<br>**JURY DEMANDED**<br>Judge: Curtis L Collier<br>Magistrate Judge: Christopher H Steger |

## PLAINTIFFS' OPPOSITION TO TRANSFEREE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Stacy Strobl and Brian Harding file this Opposition to the Motion for Summary Judgment (DE #120) filed by Joseph Investments, LLC (Joseph Investments), Steven Frost, and Lisa Frost (collectively the Transferee Defendants).

## I.    Introduction

Plaintiffs lost hundreds of thousands of dollars believing in Jonathan Frost's fraudulent schemes and when that fraud started to unravel, Jonathan Frost's family acted quickly to ensure his assets would remain in the family.

Steven Frost, Jonathan Frost's father, formed Joseph Investments, LLC ("Joseph Investments") shortly after learning that Jonathan Frost's business empire collapsed. Steven Frost then orchestrated a default and foreclosure on two properties that were owned by Jonathan Frost, through Chestnut Holdings, LLC ("Chestnut Holdings") in order to keep those properties in the family.

Plaintiffs here seek to undo that transfer and allow these assets to benefit the victims of Jonathan Frost's fraud like Plaintiffs Stacy Strobl who lost several hundreds of thousands of dollars and Brian Harding who lost tens of thousands of dollars believing that Jonathan Frost's trumped up hydrogen energy scheme, Rhino Onward International, LLC ("Rhino Onward"), was a legitimate investment opportunity. It was not. And when it failed and Jonathan Frost's accounting firm failed, several investors were left with nothing more than empty, unfulfilled promises.

Under Tennessee Uniform Fraudulent Transfers Act ("TUFTA"), creditors like the Plaintiffs are able to undo fraudulent transfers of assets when fraud is present. TUFTA recognizes that direct evidence of fraudulent intent is rare. Accordingly, courts look to "badges of fraud"—objective circumstances that suggest fraud—to infer intent. The presence of one or more badges of fraud gives rise to a presumption of fraud and shifts the burden to the defendant to explain the transaction and show it was not fraudulent. *See* Tenn. Code Ann. § 66-3-305(b); *Macon Bank & Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986) ("A 'badge of fraud' is any fact that throws suspicion on the transaction and calls for an explanation.").

The foreclosure sales of all of Chestnut Holdings LLC's assets are tainted by well-recognized badges of fraud sufficient to raise a genuine issue of material fact as to whether these sales were fraudulent and meant to keep monies away from creditors like Plaintiffs.

As a result, Joseph Investments, Steven Frost, and Lisa Frost's motion for summary judgment should be denied.

## II.  Factual Background

Joseph Investments purchased 1413 Chestnut Street (the "Chestnut Building") and 1419 Chestnut Street (the "Chestnut Lot") at a foreclosure sale on January 24, 2024.[1] Steven Frost, Jonathan Frost's father, was the sole bidder and he was the person solely responsible for putting the property into foreclosure and effectuating the foreclosure sale.[2] No cash was exchanged as part of either foreclosure sale.[3] Steven Frost is the sole member of Joseph Investments, LLC.[4] Joseph Investments, LLC has no employees.[5]

It is undisputed that at the time of this transfer, Chestnut Holdings, LLC owned the Chestnut Properties. It is also undisputed that at the time of this transfer, Jonathan Frost was the sole member of Chestnut Holdings, LLC.[6] In other words, Jonathan Frost, Steven Frost's son, functionally owned the Chestnut Properties.

---

[1] DE #121 at PageID 844.
[2] DE #121 at PageID 843-44.
[3] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 86:11-20; 93:8-12.
[4] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 8:16-25.
[5] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 8:16-25.
[6] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 10:3-12:6.

3

Steven Frost was not a passive participant in the loan that secured Chestnut Holdings the funds it needed to purchase the Chestnut Steet Building.[7] He started as a guarantor on the loan.[8] Eventually, First Horizon Bank required him to become a co-borrower on the loan, which made him personally obligated to pay the loan to First Horizon Bank.[9]

Notwithstanding the fact that Steven Frost was a co-borrower on the loan, required to make the payments on the loan to First Horizon Bank, Mr. Frost allowed the loan to go into default on two occasions.

First, he breached the covenant of indebtedness by requiring Chestnut Holdings to execute a secured promissory note without obtaining the express permission of First Horizon Bank, a breach of Section 7.16 of the Loan Agreement.[10] The effect of this allowed Steven Frost to secure the secured interest that ultimately allowed him to foreclose on the Chestnut Lot.[11]

Second, despite being a co-borrower on the loan required to make payments on the loan, Stephen Frost allowed the loan to go into default when Chestnut Holdings stopped making payments on the First Horizon Bank note on the Chestnut Building.[12]

---

[7] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 27:11-20.
[8] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 27:11-20; 39:12-40:16 and Exs. 15-16, 18, and 19.
[9] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 27:11-20; 39:12-40:16 and Exs. 15-16, 18, and 19.
[10] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 41:13-45:13; 46:9-47:16; 53:21-64:2; 66:3-16 and Ex. 14 (at SFROST00002) and Ex. 19.
[11] *Id*.
[12] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 12:11-13:12; 16:7-19:5 and Ex. 14.

Without the loan being in default, Steven Frost would not have ultimately purchased the loan as he readily admits that the loan purchase agreement was the direct result of the loan being in default.[13]

Once he acquired the loan on the Chestnut Street Building he was able to foreclose on his own default of this loan.[14]

Once he acquired a fully secured interest on the Chestnut Street Lot, he was able to foreclose on the Chestnut Street Lot.[15]

Steven Frost readily admits he undertook these maneuvers because he knew that Chestnut Holdings was going to be in serious financial jeopardy given his son's dealings with Rhino Onward International and the Croft & Frost PLLC.[16]

This is critical. Steven Frost creates Joseph Investments, LLC and uses it as a vehicle to obtain secured interests in the Chestnut Street Building and Lot knowing that Chestnut Holdings and his son's business empire is crumbling around him.

The timing is also critical.

On **September 10, 2023**, Steven Frost meets his son at the elder Frost's home where his son realizes that Steven Frost's warnings about the illegitimacy of ROI, Paul Croft, and Brian Kawamura (CEO of ROI), were accurate.[17]

---

[13] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 16:7-18:11 and Ex. 14.
[14] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 75:20-78:12 and Ex. 21.
[15] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 58:16-61:25; 75:20-78:12 and Ex. 21.
[16] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 64:3-66:2; 68:1-71:7; 74:5-75:8.
[17] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 68:1-71:7; 74:5-75:8.

**On September 12, 2023**, Jonathan Frost emails Steven Frost an email he received informing him of a default he received related to a loan to the accounting firm.[18]

On **October 13, 2023**, First Horizon informs Steven Frost of the default on the Chestnut Building note, a loan agreement to which Steven Frost is a party.[19]

On **November 14, 2023**, Steven Frost forms Joseph Investments.[20]

On **November 17, 2023**, Joseph Investments buys the loan for the Chestnut Street Building.[21]

On **December 20, 2023**, Joseph Investments informs Jonathan Frost it intends to foreclose on the Chestnut Street Building and Lot.[22]

On **December 22, 2023, December 29, 2023,** and **January 5, 2024**, Joseph Investments publishes notice of the foreclosure sale.[23]

On **January 24, 2024**, Joseph Investments obtains the title to the Chestnut Street Building and Lot via foreclosure sale.[24]

In summary, just 4 months after learning at the fated Sunday meeting with his son, that his son's business empire would collapse, Steven Frost and Jonathan Frost orchestrated a transfer of two assets held by his son to an entity Steven Frost owned to keep them from the creditors defrauded by Jonathan Frost's actions.

---

[18] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. Ex. 20.
[19] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. Ex. 14.
[20] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. 73:9-17.
[21] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. Ex. 14, SFROST000005.
[22] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. Ex. 21 and 22.
[23] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. Ex. 21 and 22 (SFROST0229).
[24] **Exhibit 1**, Joseph Investments 30(b)(6) Tr. Ex. 21.

They transferred these properties via foreclosure sale where no money exchanged hands for the pure book value of $5,800,000 when just three months earlier Chestnut Holdings had listed the price of these properties for $10,000,000.[25]

### III.     Standard of Review

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original). "[S]ummary judgment will not lie if the dispute about a material fact is genuine." *Id* (internal citations omitted).

A fact is "material" within the meaning of Rule 56(c) if its proof or disproof might affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 248. "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619,

---

[25] **Exhibit 1**, Joseph Investments 30(b)(6) at 91:20-94:9; **Exhibit 2**, Strobl Tr., 57:21-59:18 and Ex. 6.

627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

A party asserting that a fact cannot be or genuinely is disputed must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this Court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question and there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## IV. Argument

### A. Under the Tennessee Uniform Fraudulent Transfer Act, a "creditor" may recover a monetary judgment against a person who acquires an asset of a "debtor" through a transfer that is either objectively or constructively fraudulent.

The Uniform Fraudulent Transfer Act ("UFTA") prohibits transfers by a "debtor" that are objectively or constructively fraudulent as to a creditor. A "debtor" is a person "liable on a claim" to a "creditor." Tenn. Code Ann. § 66-3-302(6). A

8

"creditor" is a person with a "claim." Tenn. Code Ann. § 66-3-302(4). And a "claim" is any right to payment, "whether or not the right is reduced to judgment" and whether or not it is "disputed." Tenn. Code Ann. § 66-3-302(3).

For a transfer that is fraudulent, a creditor "may recover judgment for the value of the asset transferred" "at the time of the transfer" (subject to adjustment "as the equities may require"), "or the amount necessary to satisfy the creditor's claim, whichever is less." Tenn. Code Ann. § 66-3-309(b)-(c). The judgment "may be entered against" the "first transferee," "[a]ny subsequent transferee" who did not give value or take in good faith," or "person[s] for whose benefit the transfer was made." Tenn. Code Ann. § 66-3-309(b).

Under the Uniform Fraudulent Transfer Act, a "transfer" includes "every mode" "of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance," whether the mode is "direct or indirect, absolute or conditional, voluntary or involuntary." Tenn. Code Ann. § 66-3-302(12). The statutory comments note that, far from requiring direct action by the debtor, "transfer" includes even "involuntary transfer[s]" like "execution and foreclosure sales." Tenn. Code Ann. § 66-3-302, cmt. 12. *See* also Tenn. Code Ann. § 66-3-304(b).

Courts interpreting the definition of "transfer" in the UFTA, and the definition in the Bankruptcy Code on which it is based, have held that a "transfer" can be, not only "indirect," but also "involuntary," including the garnishment by a third party of a debtor's bank account or a foreclosure. *See*, e.g., *In re Vista Bella, Inc.*, No. 11-00149-

MAM-7, 2013 WL 2422703, at *26 (Bankr. S.D. Ala. June 4, 2013) ("A mortgage foreclosure can qualify as a transfer for fraudulent transfer purposes."); *In re Maytag Sales & Serv., Inc.*, 23 B.R. 384, 388 (Bankr. N.D. Ga. 1982) ("With respect to whether garnisheeing the debtor's bank account is considered a transfer, it is clear that an involuntary disposition of the debtor's property is nonetheless a 'transfer[.]'").

TUFTA also lists factors indicating that a transfer was made with the objective intent to hinder or defraud including, for example, whether the debtor "retained possession or control of the property transferred after the transfer"; the debtor had been sued or threatened with suit before the transfer was made or obligation was incurred; whether the debtor was insolvent; whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and whether the transfer was to an "insider."1 T.C.A. § 66-3-305(b).

These statutory factors are some of the "badges of fraud" that "throw suspicion on [a transfer] and call for an explanation." *Macon Bank & Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986) ("A 'badge of fraud' is any fact that throws suspicion on the transaction and calls for an explanation.").

The presence of one or more badges of fraud gives rise to "a presumption of fraud" that "'shifts the burden of disproving fraud to the defendant.'" *McKay v. Reece*, No. M2006-01706-COA-R3CV, 2007 WL 2702806, at *12 (Tenn. Ct. App. Sept. 11, 2007). *See United States v. Westley*, 7 F. App'x 393, 400-01 (6th Cir. 2001) (when a creditor demonstrates that a transfer is marked by badges of fraud, "the burden of proof shifts to the defendant to explain the transaction and show that it was not

fraudulent."); *Stoner v. Amburn*, No. E2012-00075-COA-R3CV, 2012 WL 4473306, at *10 (Tenn. Ct. App. Sept. 28, 2012).

Transfers are constructively fraudulent as to a creditor when the debtor did not receive "reasonably equivalent value" in exchange for the transfer, and either:

> (i) the debtor was insolvent at the time of the transfer or was rendered insolvent by the transfer;
> (ii) the debtor was engaged in or about to engage in a business or transaction for which her remaining assets were unreasonably small in relation to the business or transaction; or
> (iii) the debtor intended to incur, or believed or reasonably should have believed that she would incur debts beyond her ability to pay as they became due.

The UFTA provides some examples of "insiders," including a debtor's partners, affiliates, and managing agents, Tenn. Code Ann. § 66-3-302(7), but "insiders" are any individuals or entities "whose close relationship with the debtor subjects any transactions made between the debtor and the insider to heavy scrutiny." *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 609 (Tex. App. 2002). *See* Tenn. Code Ann. § 66-3-302, cmt. 7.

A debtor is "insolvent" if "the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." T.C.A. § 66-3-3-303(a). A debtor who is not "generally paying his or her debts as they become due" is "presumed to be insolvent." T.C.A. § 66-3-3-303(b).

### B. Several badges of fraud exist to create a genuine issue of material fact as to whether the foreclosure sales to Joseph Investments violate TUFTA.

"To make a conveyance fraudulent against creditors, it must be made without a fair consideration leaving the grantor insolvent or it must be made with actual

11

intent to hinder, delay, or defraud creditors." *Macon Bank & Tr. Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986).

When a creditor demonstrates that a transfer is marked by badges of fraud, "the burden of proof shifts to the defendant to explain the transaction and show that it was not fraudulent." *United States v. Westley*, 7 F. App'x 393, 400-01 (6th Cir. 2001); *see also Stoner v. Amburn*, No. E2012-00075-COA-R3CV, 2012 WL 4473306, at *8-9 (Tenn. Ct. App. Sept. 28, 2012) (holding that the presence of badges of fraud "throws suspicion on the transaction and calls for an explanation.").

Tennessee courts have recognized at least nine "badges of fraud:"

1. The transferor is in a precarious financial condition.
2. The transferor knew there was or soon would be a large money judgment rendered against the transferor.
3. Inadequate consideration was given for the transfer.
4. Secrecy or haste existed in carrying out the transfer.
5. A family or friendship relationship existed between the transferor and the transferee(s).
6. The transfer included all or substantially all of the transferor's nonexempt property.
7. The transferor retained a life estate or other interest in the property transferred.
8. The transferor failed to produce available evidence explaining or rebutting a suspicious transaction.
9. There is a lack of innocent purpose or use for the transfer.

*McKay v. Reece*, No. M2006-01706-COA-R3CV, 2007 WL 2702806, at *12 (Tenn. Ct. App. Sept. 11, 2007).

In this case several badges of fraud exist to throw suspicion on the transactions at issue.

**Insider Transfers**: The properties were transferred to Joseph Investments LLC, wholly owned by Steven Frost, the father of Jonathan Frost, the sole member of Chestnut Holdings. This is a classic insider relationship.

**Retention of Control:** The Frost family retained control and benefit of the properties after the foreclosure.

**Insolvency/Pending Large Money Judgments:** Chestnut Holdings was insolvent at the time of the transfers, as evidenced by the defaults and inability to pay creditors. Chestnut Holding's insolvency is further shown by its failure (and Jonathan Frost's failure) to show up here and defend its conduct in this proceeding. The Sunday September meeting between Steven Frost and Jonathan Frost further revealed that Jonathan Frost anticipated he would be subject to significant losses as a result of his failed business ventures.

**Haste in the Transfer:** The transfers occurred only a few months after Jonathan Frost learned his business had failed and he knew he would incur substantial debts.

**Threat of litigation:** Defendants assert that Plaintiffs failed to provide notice of an intent to sue prior to the January 24, 2024 public foreclosure sales, but these facts do not cause Plaintiffs' claims to fail as a matter of law.

First, there is no statutory requirement that Plaintiffs provide pre-suit notice or raise pre-transfer objections to defendants under the Tennessee Uniform Fraudulent Transfer Act (TUFTA). Tenn. Code Ann. §§ 66-3-301 *et seq*. This is distinct from other statutes which do require pre-suit notice, such as the Tennessee

13

Health Care Liability Act (HCLA). Tenn Code Ann. § 29-26-121(a)(1) (requiring that plaintiffs provide pre-suit written notice to the each named healthcare provider defendant at least 60 days prior to filing); *see Riley v. Methodist Healthcare Memphis Hospitals*, 731 Fed. App'x 481, 483–84 (6th Cir. 2018). Moreover, nothing in the Uniform Law Commission's official comments to the Uniform Fraudulent Transfer Act[1] suggests plaintiffs must comply with a pre-suit notice or pre-transfer objection requirement. *See e.g.,* Tenn. Code Ann. § 66-3-305, cmt. 1–8.

Second, Defendants misunderstand the badge of fraud identified in TUFTA § 66-3-305(b)(4), which states "[b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit." This factor assesses whether any creditor has sued or threatened to sue the debtor prior to the transfer, not necessarily whether the present creditor plaintiffs have threatened suit against the debtor. *See* TUFTA § 66-3-305(b)(4), cmt. 6(d) (*citing Harris v. Shaw*, 224 Ark. 150, 153; 272 S.W.2d 53, 54 (Ark. 1954)). In *Harris v. Shaw*, Arkansas Supreme Court noted that the appellant debtor had "numerous pending and threatened suits against her" by various creditors at the time she conferred with appellee, an attorney to whom she owed fees. 224 Ark. at 153–54; 272 S.W.2d at 55–56. The Court held that this "pendency or threat of litigation" served as one of several indicia of fraud. *Id.*

Similarly here, multiple lawsuits have been filed against Defendants prior to the January 24, 2024 foreclosure sales and concerning their fraudulent behavior and other misconduct. *See e.g.*, Compl., *Dunigan v. Frost*, No. CV2023-017297 (Maricopa Cty. Sup. Ct. Nov. 2, 2023); Compl., *Redstone Advance Inc. v. Croft LLC*, No.

14

532523/2023 (Kings Cty. Sup. Ct. Nov. 6, 2023); Compl., *Colluku v. Croft & Frost, PLLC*, No. 2023CH09344, (Cook Cty. Cir. Ct. Nov. 9, 2023). Thus, even if Plaintiffs failed to object prior to the transfer—which they were not obligated to do—Defendants had been sued shortly before the January 24, 2024 transfers and for similar conduct. This backdrop of litigation supports the conclusion that Defendants were engaged in a fraudulent scheme, as well as Plaintiffs' contention that Defendants acted with the requisite fraudulent intent with respect to the 2024 transfers.

**Lack of Reasonably Equivalent Value:** The properties were sold at foreclosure for amounts that do not reflect the fair market value, especially given the lack of competitive bidding and the insider relationship. This lack of reasonably equivalent value was orchestrated in the foreclosure sales themselves since the process involved an unusual marketing of the property and a bidding process that resulted in a single bidder vying for both processes. Had the sales been conducted under normal routine marketing conditions, they would have resulted in a higher transfer of value. In fact, prior to the foreclosure sale, the Chestnut Holdings marketed the Chestnut Building for sale for $10 million.[26] This would have placed it within Chestnut Holdings monies that could have been used to pay creditors.

---

[26] **Exhibit 2**, Strobl Tr., 57:21-59:18 and Ex. 6; *See also* **Exhibit 3**, Declaration of Taylor Vandever at ¶¶ 8-12 (discussing how the foreclosure sales at issue did not achieve a sale of the fair market value of the properties at issue and were not done under normal market conditions). Mr. Vandever is in the process of completing his commercial real estate appraisal for the properties and although Plaintiffs do not believe this is necessary to survive the pending Motion for Summary Judgment, should the Court disagree, Plaintiffs would respectfully request additional time under

"To determine reasonably equivalent value, courts generally compare the value of the property transferred with the value of that received in exchange for the transfer. A transferor has received reasonably equivalent value if it received a fair exchange in the market place for the [asset] transferred." *Wise Grp., Inc. v. Holland*, No. M202001646COAR3CV, 2023 WL 2726974, at *7 (Tenn. Ct. App. Mar. 31, 2023) (internal citations and quotations omitted).

This transaction failed that measure.

Once Plaintiffs have demonstrated the presence of badges of fraud, the burden shifts to Defendants to provide a credible, non-fraudulent explanation for the transfers. See *Reece*, 2007 WL 2702806, at *12; *Westley*, 7 F. App'x at 400-01. Joseph Investments claims that Steven Frost had a legitimate interest in protecting his previous loans to his son for these properties,[27] and this may ultimately prove to be a non-fraudulent explanation for his conduct, but deciding whether Jonathan Frost was acting to ensure his creditors like the Plaintiffs here did not obtain the value of the Chestnut Street properties instead of keeping it within his own family is ultimately a jury question, not a question that can be resolved on summary judgment.

The presence of multiple badges of fraud in this case—insider transfers, retention of control, insolvency, timing, and lack of reasonably equivalent value— creates a strong presumption of fraudulent intent under TUFTA and Tennessee case law and is sufficient to create a genuine issue of material fact that a jury should

---

Rule 56(d) to complete the real estate appraisal and will submit it via supplemental filing once it is completed.

[27] DE #121.

16

Case 1:24-cv-00140-CLC-CHS    Document 124    Filed 10/23/25    Page 16 of 22
PageID #: 1129

decide. *See Reece*, 2007 WL 2702806 (upholding verdict in favor of debtor when badges of fraud were present in the sale of real estate); *Westley*, 7 F. App'x 393, 406–07 (holding that transferees can be compelled to return the property to the transferor to satisfy the transferor's obligation and, "in states with laws like those of Tennessee, the transferee is liable even in the absence of actual fraudulent intent by the [debtor] if the conveyance leaves the transferor insolvent.")

## C. The foreclosure sales do not establish reasonable equivalent value under TUFTA.

The Transferee Defendants rely on the Supreme Court's decision in *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) for the proposition that the foreclosure sales here establish "reasonably equivalent value," and therefore they are entitled to summary judgment.[28]

*BFP's* "reasonably equivalent value" analysis arose in the bankruptcy context and sought to answer whether a foreclosure sale satisfies that standard under 11 U.S.C.A. § 548(a)(2). But Chestnut Holdings never filed for bankruptcy and is not entitled to the protections of the bankruptcy code. Instead, it is a defaulting defendant in this proceeding and although TUFTA uses the same "reasonably equivalent value" language, the Transferee Defendants do not cite to a case holding that *BFP's* holding is presumptively applicable to TUFTA's statutory requirements. Indeed, some bankruptcy courts have not applied *BFP's* standard in a state fraudulent conveyance context. *See In re Chase,* 328 B.R. 675, 686 (Bankr. D. Vt. 2005) (declining to apply BFP and holding that "Since the Debtor did not receive reasonably equivalent value

---

[28] DE #121 at PageID 855.

for the Subject Property when it was transferred to the Defendant through strict foreclosure, that transfer constitutes a fraudulent conveyance. Thus, the Trustee is entitled either to avoid the transfer or obtain a judgment against the Defendant in a sum equal to the difference between the debt and the fair market value as of the date of the transfer.").

Additionally, BFP on its terms only applies to non-collusive foreclosure sales, which did not occur in this instance. As explained above, as it relates to the Chestnut Building, Steven Frost himself orchestrated the default that put the loan into default which granted him the right to purchase the loan and the note from the bank. Yet he remained a borrower on that loan and in essence he foreclosed upon himself.

Moreover, he only took his secured interest in the Chestnut Street Lot after it became obvious that Chestnut Holdings and Jonathan Frost were in financial trouble. The execution of the security agreement that Steven Frost ultimately foreclosed upon was made in violation of the covenants against additional borrowing contained in the Chestnut Building loan agreements.[29]

In this circumstance a fact finder could find that the foreclosure sales were collusive between Steven Frost and Jonathan Frost. *BFP* did not involve any such insider transactions that lead to the foreclosure at issue in *BFP*. Instead in that case the bank itself foreclosed on the property of the bankrupt debtor and the court treated that foreclosure as a standard non-collusive transaction.

---

[29] **Exhibit 1**, Joseph Investments 30(b)(6) Tr., 57:7-61:25; at Ex. 15 at SFROST00078, § 7.16; Ex. 16 at SFROST00196; and Ex. 19 at SFROST00199-204.

Case 1:24-cv-00140-CLC-CHS    Document 124    Filed 10/23/25    Page 18 of 22
PageID #: 1131

Accordingly, *BFP* is not controlling and the jury should be able to determine whether the foreclosure sales at issue resulted in transactions of reasonably equivalent value.

### D. Plaintiffs' deposition testimony does not establish that Chestnut Holdings is not liable to Plaintiffs.

The Transferee Defendants next contend that Plaintiff's deposition testimony absolves Chestnut Holdings of any liability for the fraudulent conduct perpetrated against them. This contention is both disingenuous and legally unfounded. As the Transferee Defendants are well aware, neither Chestnut Holdings nor Jonathan Frost has appeared or otherwise defended in this action. Both entities have been duly served, have failed to respond, and have been defaulted by this Court.

The Plaintiff's deposition testimony is replete with evidence detailing the fraudulent misrepresentations and deceptive conduct of Jonathan Frost.[30] Such testimony supports Plaintiffs' claims of fraud and establishes the underlying debt owed to Plaintiffs by these defaulted parties.

Plaintiffs have filed a motion for entry of default judgment against Chestnut Holdings and Jonathan Frost, which remains pending before the Court. Upon entry of that judgment, Plaintiffs will obtain a final and liquidated judgment against both parties. This judgment will conclusively establish Chestnut Holdings and Jonathan Frost as "debtors" within the meaning of the TUFTA thereby satisfying the statutory

---

[30] **Exhibit 2**, Strobl Tr. 24:2-26:3; 27:11-40:14; 63:10-65:3; 82:5-83:16 and Ex. 7 (ROG RESPONSES); **Exhibit 4**, Harding Tr., 14:3-23:16; 26:12-28:25.

prerequisite for maintaining a fraudulent transfer action under Tenn. Code Ann. § 66-3-305.

Moreover, despite the Transferee Defendants' cherrypicked deposition excerpts, it is clear that Plaintiffs rely on the allegations of the complaint for the basis of their claims against Chestnut Holdings, claims that, as it relates to Chestnut Holdings, are now established and for which Chestnut Holdings is liable.[31]

Accordingly, the Transferee Defendants' reliance on selective excerpts of deposition testimony is misplaced. The record, together with the pending default and the imminent entry of judgment, firmly establishes that Chestnut Holdings and Jonathan Frost are liable to Plaintiffs for the underlying fraud, and that Plaintiffs' TUFTA claims are properly maintainable as a matter of law.

## CONCLUSION

For the reasons set forth above, the Court should deny the Transferee Defendants' Motion for Summary Judgment because there are genuine issues of material fact related to whether the foreclosure sales at issue violated TUFTA.

---

[31] **Exhibit 2**, Strobl Tr., 82:5-83:16; **Exhibit 4**, Harding Tr., 63:16-25.

Dated: October 23, 2025        Respectfully submitted,

By: */s/ Benjamin A. Gastel*
Benjamin A. Gastel (BPR #28699)
Anthony A. Orlandi (BPR #33988)
**Herzfeld, Suetholz, Gastel, Leniski**
 **& Wall, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Ph: (615) 800-6225
Fax: (615) 994-8625
ben@hsglawgroup.com
tony@hsglawgroup.com

Alyson S. Beridon* (BPR #40040)
**Herzfeld, Suetholz, Gastel, Leniski**
 **& Wall, PLLC**
600 Vine St., Ste 2720
Ph: (513) 381-2224
Fax: (615) 994-8625
alyson@hsglawgroup.com

*Attorneys for Plaintiffs and Proposed Class*
***Admitted Pro Hac Vice**

21

# CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of October, 2025, the foregoing document was electronically filed with the Clerk of Court to be served by way of the Court's electronic filing system (CM/ECF) upon the following:

J. Michael Holloway
Mark W. Litchford
Christopher M. Gant
Litchford, Pearce & Associates
P.O. Box 8127
Chattanooga, TN 37414
Email: michael@lpafirm.com
Email: mark@lpafirm.com
Email: chris@lpafirm.com

***Counsel for The Well Fund LLC***

Cara J Alday
Gary R Patrick
Lance W Pope
Patrick, Beard, Schulman & Jacoway
537 Market Street, Suite 300
Chattanooga, TN 37402
Email: calday@pbsjlaw.com
Email: gpatrick@pbsjlaw.com
Email: lpope@pbsjlaw.com

***Counsel for Steven Frost, Lisa Frost, and Joseph Investments, LLC***

*/s/ Benjamin A. Gastel*
Benjamin A. Gastel